**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| DISRUPTIVE RESOURCES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>BALLISTIC BARRIER PRODUCTS INC. and MAYDAY SECURITY SOLUTIONS LLC,<br><br>Defendants. | C.A. No. 24-321-JCG |

# AMENDED JOINT CLAIM CONSTRUCTION BRIEF

# TABLE OF CONTENTS


I. INTRODUCTION ....1

A. Plaintiff's Opening Position ....1

1. Legal Principles ....2

2. Person Having Ordinary Skill in the Art (POSITA) ....5

B. Defendant's Answering Position ....6

C. Plaintiff's Reply Position ....8

D. Defendants' Sur-Reply Position ....9

II. AGREED-UPON CONSTRUCTIONS ....9

III. DISPUTED CONSTRUCTIONS ....10

A. "blind"; "blinds" ....10

1. Plaintiff's Opening Position ....10

2. Defendants' Answering Position ....12

3. Plaintiff's Reply Position ....17

4. Defendants' Sur-Reply Position ....22

B. "anti-ballistic"; "ballistic resistant" ....24

1. Plaintiff's Opening Position ....24

2. Defendants' Answering Position ....27

3. Plaintiff's Reply Position ....34

4. Defendants' Sur-Reply Position ....40

C. "decorative" ....44

1. Plaintiff's Opening Position ....44

2. Defendants' Answering Position ....47

3. Plaintiff's Reply Position ....................................................49

4. Defendants' Sur-Reply Position ............................................50

D. "feeding a continuous length" ....................................................52

1. Plaintiff's Opening Position....................................................52

2. Defendants' Answering Position ............................................54

3. Plaintiff's Reply Position ....................................................57

4. Defendants' Sur-Reply Position ............................................58

E. "laminate"; "laminated sheet" ....................................................59

1. Plaintiff's Opening Position....................................................59

2. Defendants' Answering Position ............................................62

3. Plaintiff's Reply Position ....................................................66

4. Defendants' Sur-Reply Position ............................................70

F. "laminated together"....................................................................72

1. Plaintiff's Opening Position....................................................72

2. Defendants' Answering Position ............................................74

G. "flat" ............................................................................................75

1. Plaintiff's Opening Position....................................................75

2. Defendants' Answering Position ............................................77

3. Plaintiff's Reply Position ....................................................79

4. Defendants' Sur-Reply Position ............................................80

H. "flexible" .......................................................................................81

1. Plaintiff's Opening Position....................................................81

2. Defendants' Answering Position ............................................84

3. Plaintiff's Reply Position .......... 86

4. Defendants' Sur-Reply Position .......... 88

I. "flex and move"; flex and/or move"; "move and/or flex" .......... 89

1. Plaintiff's Opening Position .......... 89

2. Defendants' Answering Position .......... 92

3. Plaintiff's Reply Position .......... 95

4. Defendants' Sur-Reply Position .......... 97

J. "dropping"/ "drop" .......... 98

1. Plaintiff's Opening Position .......... 98

2. Defendants' Answering Position .......... 100

3. Plaintiff's Reply Position .......... 103

4. Defendants' Sur-Reply Position .......... 105

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Akamai Techs., Inc. v. MediaPointe, Inc.*,
159 F.4th 1370 (Fed. Cir. 2025) ....................27, 35, 36

*Astellas Pharma Inc. v. Lupin Ltd.*,
No. 23-819-JFB-CJB (D. Del. Oct. 30, 2024) ....................34

*BASF Corp. v. Johnson Matthey Inc.*,
875 F.3d 1360 (Fed. Cir. 2017) ....................34

*Bicon, Inc. v. Straumann Co.*,
441 F.3d 945 (Fed. Cir. 2006) ....................51, 62

*Biosig Instruments, Inc. v. Nautilus, Inc*,
783 F.3d 1374 (Fed. Cir. 2015) ....................93

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
388 F.3d 858 (Fed. Cir. 2004) ....................3

*Comark Commc'ns, Inc. v. Harris Corp.*,
156 F.3d 1182 (Fed. Cir. 1998) ....................3

*Cont'l Circuits LLC v. Intel Corp.*,
915 F.3d 788 (Fed. Cir. 2019) ....................3, 4

*Cordis Corp. v. Boston Sci. Corp.*,
561 F.3d 1319 (Fed. Cir. 2009) ....................4

*Datamize, LLC v. Plumtree Software, Inc.*,
417 F.3d 1342 (Fed. Cir. 2005) ....................*passim*

*Eon Corp. IP Holdings v. Silver Spring Networks*,
815 F.3d 1314 (Fed. Cir. 2016) ....................3, 84

*In re Giannelli*,
739 F.3d 1375 (Fed. Cir. 2014) ....................90, 93

*Golden Bridge Tech., Inc. v. Apple Inc.*,
758 F.3d 1362 (Fed. Cir. 2014) ....................4

*Halliburton Energy Servs., Inc. v. M-I LLC*,
514 F.3d 1244 (Fed. Cir. 2008) ....................................................................*passim*

*Hill-Rom Servs. v. Stryker Corp.*,
755 F.3d 1367 (Fed. Cir. 2014) ........................................................................50

*Horizon Pharma, Inc. v. Reddy's Labs. Inc.*,
839 F. App'x 500 (Fed. Cir. 2021) ...................................................................43

*iLife Techs. v. Body Media, Inc.*,
90 F. Supp. 3d 415 (W.D. Pa. 2015)...................................................................23

*Indect USA Corp. v. Park Assist, LLC*,
Nos. 2024-1023, 2024-1127 (Fed. Cir. Jan. 7, 2026) .................................*passim*

*Intel Corp. v. Qualcomm Inc.*,
21 F.4th 801 (Fed. Cir. 2021) ...........................................................................51

*Interval Licensing LLC v. AOL, Inc.*,
766 F.3d 1364 (Fed. Cir. 2014) ....................................................................*passim*

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004) ......................................................................*passim*

*Lighting Solutions, LLC. v. Agilight, Inc.*,
750 F.3d 1304 (Fed. Cir. 2014) ...................................................................4, 103

*In re Mobile Telecomms. Techs., LLC*,
265 F. Supp. 3d 454 (D. Del. 2017)...................................................................19

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014).....................................................................................*passim*

*Omega Eng'g, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003) .................................................................21, 103

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ....................................................................*passim*

*Samsung Elecs. Co. v. Tech. Consumer Prods., Inc.*,
No. 1:23-CV-186 (D. Del. June 12, 2024) ..........................................21, 34, 36

*SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*,
242 F.3d 1337 (Fed. Cir. 2001) ....................7, 15

*SIMO Holdings, Inc. v. H.K. uCloudlink Network Tech., Ltd.*,
983 F.3d 1367 (Fed. Cir. 2021) ....................104

*Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*,
844 F.3d 1370 (Fed. Cir. 2017) ....................*passim*

*Southwall Techs., Inc. v. Cardinal IG Co.*,
54 F.3d 1570 (Fed. Cir. 1995) ....................7

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
775 F.2d 1107 (Fed. Cir. 1985) ....................4

*In re Swinehart*,
439 F.2d 210 (C.C.P.A. 1971) ....................29

*Thorner v. Sony Computer Entm't Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012) ....................*passim*

*United Carbon Co. v. Binney & Smith Co.*,
317 U.S. 228 (1942) ....................27

*Verizon Services Corp. v. Vonage Holdings Corp.*,
503 F.3d 1295 (Fed. Cir. 2007) ....................7, 13, 15, 21

**Statutes, Rules & Regulations**

35 U.S.C. § 112 ....................26

35 U.S.C. § 112(b) ....................34

35 U.S.C. § 112(d) ....................50

35 U.S.C. § 282 ....................34

**Other Authorities**

*Merriam-Webster's Collegiate Dictionary* (11th ed. 2003) ....................61, 68

MPEP § 1205 ....................20

Roy C. Laible, *Fibrous Armor*, in *Ballistic Materials and Penetration Mechanics* (1980) ....................................................................38, 67, 85, 94

Pursuant to the Scheduling Order (D.I. 56, as modified by D.I. 83), Plaintiff Disruptive Resources, LLC ("Disruptive" or "Plaintiff") and Defendants Ballistic Barrier Products, Inc. and Mayday Security Solutions LLC ("Defendants") hereby submit their Joint Claim Construction Brief to addresses the proper construction of disputed claim terms in U.S. Patent Nos. 10,473,437 (the "'437 Patent"), 11,561,070 (the "'070 Patent"), 11,566,872 (the "'872 Patent"), 11,828,574 (the "'574 Patent"), 11,828,575 (the "'575 Patent"), 11,879,707 (the "'707 Patent"), and 11,920,905 (the "'905 Patent") [Joint Appx. Exs. 1 through 7].

## I. INTRODUCTION

### A. <u>Plaintiff's Opening Position</u>

The asserted patents share a common theme: practical, lightweight anti-ballistic window coverings and interior barriers that can be deployed (or transitioned) from an open or retracted condition into a protective condition to resist ballistic threats. The disclosures are not limited to a single product form factor. Instead, they describe a spectrum of implementations for protecting openings and spaces in buildings and vehicles, including windows, doors, hallways, and other vulnerable entry paths for projectiles, and they repeatedly frame protection in functional terms, such as barriers that resist penetration by bullets and shrapnel, in particular flexible barriers of relatively lightweight construction appropriate for protecting already existing structures.

At the product level, the family spans both "blind"-type and broader "barrier"-type embodiments. The specifications describe blinds with rotatable slats (including venetian-style and vertical blinds), non-slat implementations, including roll-down or roll-up sheet barriers (shade or curtain-like), flexible hanging barriers, and barriers deployed within or between glass panes for mobile or architectural applications.

A central technical premise repeated across the patent family is that a protective barrier made from layered ballistic resistant materials can be configured to move or flex under ballistic impact to dissipate energy, which the patents present as beneficial to stopping or reducing penetration. The disclosures also describe optional edge, bottom, and side securing approaches that can stabilize a deployed barrier while still permitting meaningful flex or motion. In parallel, the later patents in the family operationalize the materials side of the inventions by focusing on scalable manufacturing of multi-layer laminates, including continuous production approaches that feed elongated sheet materials into bonding, and downstream slitting/cutting into product components.

**1. Legal Principles**

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). In claim construction, courts examine the patent's intrinsic evidence to define the patented invention's scope. *See*

*id.; C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004). "From this list of sources, 'the claims themselves provide substantial guidance as to the meaning of particular claim terms.'" *Cont'l Circuits LLC v. Intel Corp.*, 915 F.3d 788, 796 (Fed. Cir. 2019).

There is a strong presumption that claim terms carry their plain and ordinary meaning as understood by a person of ordinary skill in the art at the time of the invention. *See Phillips*, 415 F.3d at 1312–13. Indeed, "a court need not attempt the impossible task of resolving all questions of meaning with absolute, unequivocal finality." *See Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1318 (Fed. Cir. 2016). "Such an endeavor could proceed ad infinitum, as every word—whether a claim term itself, or the words a court uses to construe a claim term—is susceptible to further definition, elucidation, and explanation." *Id.*

"'Although the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (citation omitted). Specifically, courts may not rely on the specification to "redefine words" in the claim language. *See Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366-67 (Fed. Cir. 2012). In particular "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims

absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004); *see also SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985).

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution." *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner*, 669 F.3d at 1365); *see also Lighting Solutions, LLC. v. Agilight, Inc.,* 750 F.3d 1304, 1309 (Fed. Cir. 2014). The standards for finding lexicography or disavowal are "exacting." *GE Lighting Solutions*, 750 F.3d at 1309. To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *Cont'l Circuits*, 915 F.3d at 797 ("To disavow claim scope, the specification must contain 'expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.'") (citation omitted).

### 2. Person Having Ordinary Skill in the Art (POSITA)

Claim construction is viewed through the lens of a person having ordinary skill in the art (POSITA). *See Phillips v. AWH Corp.*, 415 F.3d at 1313. Plaintiff submits that a POSITA at the relevant time would have had either: (i) at least a bachelor's degree in materials science, materials engineering, mechanical engineering (with a materials focus), or a closely related field in the relevant sciences, and approximately one to two years of practical experience working with ballistic or impact-resistant materials (including laminated fabrics, polymer sheets, and associated bonding/assembly techniques); or (ii) in lieu of a formal degree, several years of hands-on experience (e.g., approximately three to five years) designing, fabricating, testing, selecting, or integrating ballistic-resistant materials and laminates for protective barriers.

### B. Defendant's Answering Position

Plaintiff systematically strips key claim terms of their structural and contextual limits, recasting them as broad, functional abstractions untethered from the intrinsic record in an effort to expand the claims beyond what the patentee actually invented and prosecuted. In stark contrast, Defendants' constructions are anchored firmly in the governing *Phillips* framework, under which "the claims themselves provide substantial guidance as to the meaning of particular claim terms," and the specification is "the single best guide to the meaning of a disputed term." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314–15 (Fed. Cir. 2005) (en banc). Consistent with that directive, Defendants ground each disputed term in the claims, the specification, and—where particularly instructive—the prosecution history, which "often inform[s] the meaning of the claim language by demonstrating how the inventor understood the invention." *Id.* at 1317.

Several of the disputed terms at issue here, particularly those describing characteristics such as "flexible," "anti-ballistic" or "ballistic resistant," "flat," and "decorative," are expressed in purely qualitative or functional language without any accompanying objective boundaries. Where a patent "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention," the claims are indefinite. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). As shown below, the intrinsic record provides no meaningful standard by

which a person of ordinary skill in the art ("POSITA") could determine the scope of several of these terms, rendering them indefinite under *Nautilus*.

At the same time, where the intrinsic record reflects a clear and deliberate limitation on claim scope, Defendants' constructions give effect to those limits. The Federal Circuit has repeatedly held that a patentee may act as its own lexicographer or disclaim broader scope through the specification or prosecution history, so long as that intent is clearly expressed. *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365–67 (Fed. Cir. 2012); *SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*, 242 F.3d 1337, 1340–45 (Fed. Cir. 2001); *Verizon Services Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1306–08 (Fed. Cir. 2007). Here, the patentee drew repeated structural and functional distinctions during prosecution, particularly between the claimed inventions and prior-art alternatives, to obtain allowance. Those arguments are binding and must be respected in construing the claims. *See Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995).

Defendants' constructions therefore adhere to the fundamental principle that claims "must be read in view of the specification, of which they are a part," and may not be divorced from the technological context in which the patentee used them. *Phillips*, 415 F.3d at 1315. Plaintiff's competing approach does exactly that, recasting concrete, technology-specific limitations as abstract, boundary-less

concepts. The Court should reject those expansions and adopt constructions that are faithful to the intrinsic record and that preserve the limits that define the claimed inventions.

For clarity, the remainder of this brief follows the order in which the terms are presented in Plaintiff's opening claim construction brief.

### C. **Plaintiff's Reply Position**

Defendants' Answering Brief does not identify genuine uncertainty in the claim language. Instead, it repeatedly narrows ordinary terms by importing embodiment-specific features into the claims and recasts breadth objections as indefiniteness challenges. That is not the *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) framework. Claim terms are construed according to their ordinary and customary meaning to a Person of Ordinary Skill in the Art (POSITA), not by litigation-driven limitations. Absent lexicography or a clear and unmistakable disavowal, courts may not read embodiment-specific restrictions into the claims, *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004) (holding it is improper to read limitations from a preferred embodiment into the claims absent a clear indication that the patentee intended that result); *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (holding that claim scope departs from ordinary meaning only where the patentee acts as its own lexicographer or clearly disavows broader scope).

Defendants' indefiniteness arguments fail for the same reason. For terms such as "anti-ballistic," "ballistic resistant," "flat," "flexible," and "decorative," Defendants do not identify a failure of notice to a skilled artisan; they instead demand rigid metrics or absolute boundaries the patents do not claim and the law does not require. The touchstone remains reasonable certainty, not mathematical precision. *Nautilus*, 572 U.S. at 910.

The proper constructions, and the reasons Defendants' contrary positions fail, are addressed below.

### D. <u>Defendants' Sur-Reply Position</u>

Included in its arguments below.

## II. AGREED-UPON CONSTRUCTIONS

| Claim Term | Agreed-upon Construction |
|---|---|
| "ballistic" | relating to projectiles |

## III. DISPUTED CONSTRUCTIONS

### A. <u>“blind”; “blinds”</u>

| Claim Term | Plaintiff’s Construction | Defendants’ Construction |
|---|---|---|
| “blind”/ “blinds” | covering assembly that is configurable between open and close states | a window covering structure formed from a plurality of slat like elements arranged to selectively open and close |

#### 1. Plaintiff’s Opening Position

Throughout the ‘437 Patent, “blind” and “blinds” are consistently defined by their capacity to be configured between open and closed states, which is common to every disclosed embodiment, regardless of structure. The specification states that “[g]enerally, any of the blind systems provided herein will typically be provided with blinds that can be placed in an open state…[and] closed at the request of a user, in which case the blinds may also be in a protective state.” ‘437 Patent, col. 5, ll. 61–67. [Joint Appx. Ex. 1]. The Summary likewise defines the blind at the highest level of generality as a system “configured to transition the blinds from an open state to a closed, protective state.” ‘437 Patent, col. 1, ll. 57–58. [Joint Appx. Ex. 1].

The specification presents slat-based venetian blinds (Figure 1) as merely one example embodiment. Figure 5 depicts a second distinct embodiment in which blinds reside between two panes of safety glass. Figure 6 depicts a third embodiment, a roll-up blind system 305, explicitly described as utilizing “a contiguous sheet of material, or patches of such material, rather than slats.” ‘070 Patent, col. 12, ll. 55–

57 [Joint Appx. Ex. 2]; '872 Patent, col. 11, ll. 60-62 [Joint Appx. Ex. 3]; '574 Patent, col. 12, ll. 60-62 [Joint Appx. Ex. 4]; '575 Patent, col. 12, ll. 60-62 [Joint Appx. Ex. 5]; '707 Patent, col. 12, ll. 60-62 [Joint Appx. Ex. 6]. This roll-up system "may be made of bullet resistant fabric such as Kevlar or Lexan or DuPont™ Tensylon®" and is described as a "blind" throughout. '437 Patent, col. 5, ll. 33–34 [Joint Appx. Ex. 1].




FIG. 1




FIG. 5




FIG. 6

The reexamination of '437 Patent confirmed that a "blind" encompasses covering assemblies that contain no slats of any kind. The claims recite "a fabric comprised of a light-weight anti-ballistic material," with no reference to slats, slat-like elements, or any plurality of structural members. '437 Patent C1, cls. 24, 28, 30, 33 [Joint Appx. Ex. 1]. Claim 28, for example, recites a blind "comprising a fabric comprised of a light-weight anti-ballistic material" suspended from a mounting structure with a bottom rail, transitioning between retracted and protective states.

‘437 Patent C1, cl. 28 [Joint Appx. Ex. 1]. The USPTO’s determination that these fabric-only claims are patentable (adding them to the patent during its reexamination) constitutes authoritative confirmation that “blind” as used in the ‘437 Patent encompasses a single-sheet fabric assembly.

**2. Defendants’ Answering Position**

The intrinsic record resolves the meaning of “blind” and “blinds” without ambiguity. Throughout the specification, the patentee consistently uses those terms to refer to a particular class of window coverings—namely, structures comprised of multiple slats, louvers, or vanes that can be adjusted relative to one another to control light. The patent begins by situating the invention squarely within the established technology of slatted blinds, explaining that “[w]indow blinds, such as venetian blinds, and vertical blinds have found widespread use … as window coverings because of their ability to selectively vary the amount of light… by the varying of a plurality of vanes, louvers or slats.” ’437 Patent at 1:14–19 [Joint Appx. Ex. 1]. The purpose of the invention was simply to use this “widespread use of window blinds to provide unauthorized entry protection.” *Id.* at 1:25–26. In summarizing the invention, the specification plainly states that “[t]he blinds provide[] an anti-entry function, such as a bullet proof system *characterized by* light weight, high ballistic resistant *vanes, louvers or slats*.” *Id.* at 1:61–63 (emphases added).

This introduction to "blinds" at the beginning of the specification confirms that when the specification discusses "blinds," it is talking about a window covering with a plurality of slat-like elements (e.g., "vanes, louvers or slats"). *Id.* at 1:14–19. Nothing in the specification suggests that a continuous sheet, curtain, or other monolithic barrier is a "blind" within the meaning of the patent. Under *Phillips*, this consistent and exclusive usage in the specification is the "single best guide to the meaning of a disputed term." 415 F.3d at 1315.

The prosecution history further and decisively confirms that "blind" was used in this narrower, structural sense and excludes the broader category of curtains and continuous sheets. First, in responding to rejections over a barrier reference, the applicant explained that the "barrier provides no ability to regulate light flow, *a necessary feature in any window blind*." '437 Patent File History, Resp. to Office Action dated October 2, 2017 at 10 (p. 167 of 405) (emphasis added) [Joint Appx. Ex. 8]. The applicant then defined the invention as including slats: "*In contrast to the invention*, the De Gaglia control function merely raises a collapsible barrier, *with no ability to control slats*." *Id.* Resp. to Office Action dated Reply filed April 16, 2018 at 10 (p. 124 of 405) (emphasis added) [Joint Appx. Ex. 9]. The applicant's own characterization during prosecution of what "the invention" is required slats, and this is controlling. *See Verizon Services Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1306–08 (Fed. Cir. 2007).

Defendants' construction is further confirmed in the Appeal Brief filed during prosecution. The applicant submitted a summary of the claimed subject matter in what is now claim 24 (prosecution claim 22), "mapped to the specification." '437 Patent File History, Appeal Brief filed April 11, 2019 at 5–6 (p. 40 of 405) [Joint Appx. Ex. 10]. Even though that claim does not expressly recite slats, the Applicant mapped the blind comprising a fabric to disclosures of slats. *Id.* (citing ¶0004, 0010, 0020, 0035 and original claim 11). For example, paragraph 0010 of the '437 patent specification as filed discloses "blinds … characterized by light weight, high ballistic resistant vanes, louvers or slats." *Id.* Specification filed September 3, 2014 at 2 (p. 378 of 405) [Joint Appx. Ex. 11]. Likewise, paragraph 0020 discloses "slats 10" that "can be constructed of a number of different materials, including … fabric …." *Id.* at 4 (p. 380 of 405) [Joint Appx. Ex. 11]. And original claim 11 recites "a plurality of slats comprising a ballistic resistant material." *Id.* Original Claims, filed September 3, 2014 at 12 (p. 388 of 405) [Joint Appx. Ex. 12].[1] Thus, when given the option to map the claimed blind to the specification, Applicant specifically mapped it to slat disclosures, even when the claim did not mention slats.

---

[1] The cites to paragraphs 0004 and 0035 seem to be typos as neither is relevant, but adjacent paragraphs also equate "blinds" with slats. *See* '437 File History, Specification filed September 3, 2014 at 2 and 8 (pp. 378 and 384 of 405), Specification ¶¶ [003] and [0034] [Joint Appx. Ex. 11].

Taken together, the specification and prosecution history make explicit the only possible meaning for blinds in the ’437 patent: a window covering structure formed from a plurality of slat-like elements arranged to selectively open and close. The applicant’s repeated explanations and distinctions over solid barriers are not merely descriptive; they define the boundary of the invention. Under *SciMed Life Systems* and *Verizon Services*, where the specification and prosecution history consistently distinguish particular structural alternatives, the claims must be interpreted in light of that distinction. *SciMed Life Systems*, 242 F.3d at 1340–45; *Verizon Services*, 503 F.3d at 1306–08. The intrinsic record here draws a clear line between (i) a blind composed of discrete, rotatable slats and (ii) a continuous barrier that lacks such structure, and the claims cannot be expanded to cover both.

Plaintiff’s proposed construction (“a covering assembly that is configurable between open and closed states”) cannot be reconciled with this intrinsic record. It strips the term “blind” of the very structural features that the specification and prosecution history identify as essential, and it would encompass exactly the types of continuous barriers that the applicant disclaimed during prosecution. *See Verizon Services*, 503 F.3d at 1306–08. Here, the intrinsic record does not merely suggest a narrower meaning; it requires one.

Plaintiff’s arguments to broaden this term all fail. First, requiring blinds to have an open and closed state is entirely consistent with blinds that have slat-like

elements. In fact, Defendants' construction requires "slat-like elements arranged to selectively open and close." The teachings Plaintiff relies on do not justify broadening the meaning of blinds. Second, Plaintiff's alleged distinct embodiments do not justify a broader meaning because one of them expressly discloses "slats 110 used between the safety glass panes 135." '437 Patent at 4:62–63 [Joint Appx. Ex. 1]. The other embodiment does not provide any detail about its blind that confirms it is not slatted. Tellingly, Plaintiff cites to *other patents filed after the '437 patent* when it alleges that this embodiment is "explicitly described as utilizing 'a contiguous sheet of material … rather than slats.'" Joint CC Br. at 10–11. These later patents with added matter to the '437 patent cannot change the construction of blind for the '437 patent. Finally, Plaintiff's reliance on the reexamination resulting in claims that recite fabric with no reference to slats does not change the analysis. Claim 24 already recited fabric with no reference to slats and the applicant mapped it to specification teachings of slats, as discussed above. In fact, the specification expressly teaches that slats may be made of fabric. '437 Patent at 2:36–41, 4:62–65 [Joint Appx. Ex. 1]. The reexamination does not support broadening the term "blind" beyond how applicant consistently used it in the specification and during prosecution.

In light of the specification's exclusive focus on slatted structures and the prosecution history's clear disavowal of barriers, "blind" and "blinds" should be

construed to mean a window covering structure formed from a plurality of slat-like elements arranged to selectively open and close. This construction aligns with the intrinsic evidence, preserves the structural boundaries of the invention, and avoids improperly expanding the claims to encompass subject matter the patentee expressly disclaimed.

**3. Plaintiff's Reply Position**

Defendants would rewrite "blind" as limiting the scope of the '437 Patent to only window coverings "formed from a plurality of slat-like elements," or, in other words, only blinds with slats. That construction reads the patentee's functional definition out of the specification and reads expressly claimed, PTO-confirmed subject matter out of the claims. Defendants' construction depends not merely on ignoring specification language, but also creating prosecution disclaimer where there is none. The record they cite does not clearly and unmistakably redefine every claimed "blind" as a plurality of slat-like elements.

First, the specification defines "blind" at the highest level of generality, by the capacity to be configured between open and closed states, a feature common to every disclosed embodiment regardless of structure. The patent states that "any of the blind systems provided herein will typically be provided with blinds that can be placed in an open state … [and] closed at the request of a user, in which case the blinds may also be in a protective state." '437 Patent at 5:61–67 [Joint Appx. Ex. 1]; *see also id.*

at 1:57–58 (Summary defines the system as “configured to transition the blinds from an open state to a closed, protective state”) [Joint Appx. Ex. 1]. Slatted venetian blinds (Figure 1) are merely one example. Figure 5 depicts blinds confined between safety-glass panes, and Figure 6 depicts a roll-up system. Defendants’ construction expressly reads out two exemplary embodiments from the specification:




FIG. 6

The disclosure in the related family of patents describes the Figure 6 roll-up system as “a contiguous sheet of material, or patches of such material, rather than slats.” ’070 Patent at 12:55–57 [Joint Appx. Ex. 2]; ’872 Patent at 11:60–62 [Joint Appx. Ex. 3]; ’574 Patent at 12:60–62 [Joint Appx. Ex. 4]; ’575 Patent at 12:60–62 [Joint Appx. Ex. 5]; ’707 Patent at 12:60–62 [Joint Appx. Ex. 6]; *see also* ’437 Patent at 5:33–34 (roll-up system “made of bullet resistant fabric such as Kevlar or Lexan or DuPont™ Tensylon®” and described as a “blind”) [Joint Appx. Ex. 1]. Limiting

a term to the first background example is precisely what *Phillips* forbids. 415 F.3d at 1323.

Second, and dispositively, the reexamination certificate confirms that a “blind” encompasses coverings containing no slats. The reexamined claims recite a blind “comprising a fabric comprised of a light-weight anti-ballistic material,” with no reference to slats, slat-like elements, or any plurality of structural members. ’437 Patent C1, cls. 24, 28, 30, 33 [Joint Appx. Ex. 1]. Claim 28 recites a blind comprising such a fabric, suspended from a mounting structure with a bottom rail, transitioning between retracted and protective state, without any slat. A construction that excludes expressly claimed, PTO-confirmed subject matter is not a construction but a rewrite. *Cf. In re Mobile Telecomms. Techs., LLC*, 265 F. Supp. 3d 454, 460 (D. Del. 2017) (claims “will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope”).

Defendants overread the prosecution history. The cited remarks distinguishing US Patent No. 9,134,097 (“De Gaglia”) addressed a very specific point: why a floor-rising security barrier is not a “window blind” used to regulate light at a window. In that context, the applicant contrasted De Gaglia’s one-shot protective barrier with window blinds that control light “by dropping into the window and/or by rotating slats.” That is disjunctive language, not a definitional surrender of non-slat embodiments. The same remarks confirm the distinction was functional as much as

structural: a window blind hangs in a window and regulates light, whereas De Gaglia's podium shield does not provide disclosure on "light regulation." Defendants appear to forget that roll-up blinds, not just slat-like blinds, can be partially closed to regulate the amount of light.



FIG. 2



FIG. 3

Defendants' reliance on the appeal brief's specification citations fares no better. An applicant's citation to specification passages to show written-description support for a claim does not, without more, amount to a clear surrender of claim scope. The appeal brief required only "[a] concise explanation of the subject matter defined in each of the rejected independent claims," MPEP § 1205, and the cited

mapping shows only that the applicant identified support in portions of the disclosure that included slatted embodiments; it does not say that "blind" means only a slatted structure. A record citation offered to show written-description support is not a clear and unmistakable surrender of non-slat blinds, and the reexamination, later in time and reflecting the PTO's considered view, confirms the broader scope. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323–24 (Fed. Cir. 2003); *Samsung*, at *12 (rejecting a narrowing construction that "contradicts" the claim language and finding no prosecution disclaimer where the examination concerned "a different issue").

Third, Defendants' own premise defeats their construction. They emphasize the applicant's argument that a prior-art barrier "provides no ability to regulate light flow, a necessary feature in any window blind." Light regulation is exactly what Plaintiff's construction captures: a retractable or roll-up sheet blind regulates light by deployment and retraction, satisfying the very functional criterion Defendants invoke. The distinction the applicant drew was between a window blind and an inert barrier. It is not between "slats" and "sheets."

Nor does *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1306–08 (Fed. Cir. 2007) help Defendants. There, the patentee repeatedly characterized the invention itself in a manner that excluded the broader reading. Here, the cited remarks were directed to an unremarkable statement that De Gaglia

was not a blind. This does not amount to an unambiguous representation that every "blind" in the '437 Patent must consist of a plurality of slat-like elements. At most, the record shows use of slatted blinds as one important embodiment, not a controlling definitional limitation.

Defendants also note that slats themselves may be made of fabric. True enough, but that does not save their construction, which requires "a plurality of slat-like elements." The reexamination claims do not. A claim to a blind "comprising a fabric" cannot be rewritten to require a plurality of slat-like members absent clear claim language or unmistakable disclaimer, and neither exists here.

Plaintiff's construction of "a covering assembly that is configurable between open and closed states" tracks the specification's disclosure and resolves the actual dispute (slats versus no slats) without importing limitations.

**4. Defendants' Sur-Reply Position**

Plaintiff argues that Defendants are rewriting "blinds" in the '437 patent to require slats. But it was the applicant (not Defendants) who expressly described the blinds as "*characterized by* light weight, high ballistic resistant *vanes, louvers or slats*," '437 Patent at 1:61–63 (emphases added) [Joint Appx. Ex. 1], and explained that "*[i]n contrast to the invention*, the De Gaglia control function merely raises a collapsible barrier, *with no ability to control slats*," '437 Patent File History, Resp. to Office Action dated April 16, 2018 at 10 (p. 124 of 405) (emphases added) [Joint

Appx. Ex. 9]. Plaintiff fails to address these intrinsic-record statements that define the term "blinds" for the '437 patent.

Plaintiff's current arguments cannot change the applicant's own definition in the intrinsic record. First, Plaintiff's reliance on related applications is misplaced because continuation-in-part disclosures "should not be used to construe claim terms appearing in the parent patent, even if the claim terms are common." *iLife Techs. v. Body Media, Inc.*, 90 F. Supp. 3d 415, 427 (W.D. Pa. 2015) (citing cases). Second, the absence of the word "slats" from the reexamined claims does not mean that coverings without slats are "expressly claimed, PTO-confirmed subject matter" (~~Pltf. RB 3).~~Joint CC Br. at 19). To the contrary, the inclusion of the term "blind" in those claims requires slats based on the intrinsic record.

Third, Plaintiff's attempt to minimize its De Gaglia statements are wrong. The applicant did not simply argue that De Gaglia was not a blind. Instead, the applicant stated that "*[i]n contrast to the invention*, the De Gaglia control function merely raises a collapsible barrier, *with no ability to control slats*." '437 Patent File History, Resp. to Office Action dated April 16, 2018 at 10 (p. 124 of 405) (emphasis added) [Joint Appx. Ex. 9]. Notably, raising a collapsible barrier (as in De Gaglia) fits squarely within Plaintiff's construction.

Thus, the intrinsic record shows that Defendants' proposed construction is correct.

### B. "anti-ballistic"; "ballistic resistant"

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "anti-ballistic"; "ballistic resistant" | configured to provide ballistic resistance | Indefinite |

#### 1. Plaintiff's Opening Position

The terms "anti-ballistic" and "ballistic resistant" appear throughout all seven asserted patents and are used to describe materials, structures, and systems that resist penetration by high-speed projectiles. Plaintiff's proposed construction of "configured to provide ballistic resistance" faithfully captures the ordinary meaning of these terms as reflected uniformly across the intrinsic record of all seven patents.

Figures 7 and 7A of the ‘070 and ‘872 Patents depict the laminated structure of the “anti-ballistic” and “ballistic resistant” materials as discrete stacked layers of woven or unwoven sheet materials, cloth-type materials whose capacity to resist ballistic penetration is an inherent physical property.




*FIG. 7*




*Fig. 7A*

The ‘437 Patent describes the claimed blind system as one comprised of “ballistic resistant material including Kevlar, Lexan, Tensylon, and/or a boron treated material.” ‘437 Patent, cl. 9 [Joint Appx. Ex. 1]. These are widely recognized materials known to withstand ballistic penetration, and their enumeration anchors both “anti-ballistic” and “ballistic resistant” to a well-understood technical concept. The ‘437 Patent’s Abstract describes the inventive system as one in which “the

blinds are adapted to be resistant to penetration by high-speed ballistic objects," making clear that "ballistic resistant" means having the capability to withstand such penetration. '437 Patent, Abstract [Joint Appx. Ex. 1].

The specifications shared across the '070, '872, '574, '575, and '707 Patents provide a more detailed and consistent treatment of both terms. Those specifications explain that the barrier layer is "comprised of a laminate of a plurality of layers of flexible anti-ballistic material" and enumerate the specific materials that qualify: Kevlar (poly-para-phenylene terephthalamide), Lexan (transparent polycarbonate of high impact strength), Tensylon (ultrahigh molecular weight polyethylene), boron-treated cloth, and combinations thereof. '070 Patent, col. 5, ll. 59–60; col. 6, ll. 1–17 [Joint Appx. Ex. 2]. The specifications further explain that both terms are used to describe the same attribute, the capacity to resist ballistic penetration by pairing them in a single description of the barrier: an "anti-ballistic protection system" comprising "layers of lightweight, flexible, ballistic resistant material." '070 Patent, Abstract [Joint Appx. Ex. 2].

The '905 Patent, directed to the manufacturing process for anti-ballistic laminates, corroborates this understanding across the entire patent family. Its opening substantive paragraph employs "anti-ballistic" as an unqualified term of art—referring without definition to "laminated flexible anti-ballistic materials" used in "anti-ballistic products"—confirming the inventors treated the term as having a

settled, self-evident meaning. '905 Patent, col. 3, ll. 17–20 [Joint Appx. Ex. 7]. The '905 Patent further expressly equates "anti-ballistic properties" with certification to "standards of bullet-resistance," stating that laminates "can be used to produce products that have anti-ballistic properties, and which might be certified to various standards of bullet-resistance." '905 Patent, col. 12, ll. 19–22 [Joint Appx. Ex. 7].

For all the foregoing reasons, "anti-ballistic" and "ballistic resistant" should be construed as "configured to provide ballistic resistance."

**2. Defendants' Answering Position**

The terms "anti-ballistic" and "ballistic resistant" are indefinite under 35 U.S.C. § 112 because the patents fail to provide any objective boundary or metric to inform a POSITA what level of "anti-ballistic" performance is required. Under the Supreme Court's test in *Nautilus*, a patent claim must, when "viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." 572 U.S. at 910. The *Nautilus* standard repudiated the prior "insolubly ambiguous" test for indefiniteness, emphasizing that patents must avoid a '"zone of uncertainty"' that would leave competitors to guess at a claim's scope. *Id.* at 901, 909–10. (quoting *United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 236, (1942)).

Applying that standard here, the claims' recitation of "anti-ballistic" and "ballistic resistant" falls short, because neither the patents' specifications nor any

clear prosecution disclaimer gives a POSITA reasonably certain criteria for what qualifies as "ballistic" or "ballistic resistant." *See Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014) ("The claims, when read in light of the specification and the prosecution history, must provide objective boundaries for those of skill in the art."); *see also Akamai Techs., Inc. v. MediaPointe, Inc.*, 159 F.4th 1370, 1379 (Fed. Cir. 2025) ("best route" and "optimal" indefinite for lack of objective boundary despite being qualitatively understandable).

Here, the intrinsic record provides no measure or standard for "anti-ballistic" or "ballistic resistant." The patents' disclosures use these terms only in a descriptive or qualitative sense, never quantifying ballistic performance. For instance, the specifications refer to "anti-ballistic … material" ('437 Patent at 5:27 [Joint Appx. Ex. 1]) and "ballistic resistant material" ('070 Patent at Abstract [Joint Appx. Ex. 2]), but nowhere do they define *how much* ballistic resistance is required, nor do they mandate any industry standards or testing protocols for determining ballistic resistance (for example, threshold bullet velocities, NIJ protection levels, V0/V50 ballistic limits, or standardized projectile tests). The '905 patent highlights the problem. It states that in "a *preferred* embodiment" the "laminates can be used to produce products that have anti-ballistic properties, and which *might be certified* to *various* standards of bullet-resistance." '905 Patent at 12:19–22 (emphases added) [Joint Appx. Ex. 7]. This discussion of a preferred embodiments only suggests that

the material might be certified (without requiring it) and does not even specify which standard, instead leaving it open to various standards. This preferred embodiment does not provide any objective boundaries. The other patents are similarly deficient, stating that it is "desirable that the blinds meet NIJ level IIIA standards or above" without requiring it. *See, e.g.,* '707 Patent at 19:64–65 [Joint Appx. Ex. 6].

The claims similarly use these terms as functional descriptors, reciting components like a "ballistic resistant material" or a "ballistic resistant laminate" configured to prevent a ballistic object, including a bullet or explosive shrapnel, from penetrating the laminate (*see, e.g.*, '905 Patent, claim 1 [Joint Appx. Ex. 7]). But this circular usage—merely stating that the laminate must resist bullet penetration—does not demarcate the boundary between what is "ballistic resistant" and what is not. It offers no clarification as to which bullets (of what caliber, velocity, weight, etc.) must be stopped, under what conditions (distance, number of shots, etc.), or *to what extent* (e.g., stop all penetration versus merely slow down projectiles) in order for a material to meet the "ballistic resistant" limitation.

Terms of degree require guiding standards; none exist here. The Federal Circuit has long held that relative terms or words of degree are indefinite if the patent provides no objective standard for measuring the scope of the term. *Interval Licensing*, 766 F.3d at 1370–74 (finding "unobtrusive manner" indefinite where patent gave no standard for measuring unobtrusiveness). Likewise, broad, result-

oriented claim language can render claims indefinite when no guidance is given on how to achieve or measure the claimed result. *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1255 (Fed. Cir. 2008) (purely functional claim language is indefinite if it fails to '"provide a clear-cut indication of the scope of subject matter embraced by the claim"') (quoting *In re Swinehart*, 439 F.2d 210, 212-13 (C.C.P.A. 1971)). Here, "anti-ballistic" and "ballistic resistant" are at best terms of degree: how resistant must the material be to qualify as "ballistic resistant" or "anti-ballistic"? And at worst, they are wholly functional, result-based descriptors. It tells a POSITA only that the material or structure should achieve a certain outcome (slowing or stopping bullets), without any instruction as to the minimum required performance or manner of achieving it. Under controlling law, this renders the claims indefinite. Indeed, even a lightweight fabric will slow a bullet to some degree. But no reasonable POSITA would conclude that a lightweight fabric is "ballistic resistant." The question remains one of degree. How much must a material slow a bullet to be considered "ballistic-resistant," or how well must a material stop a bullet to be considered "anti-ballistic."

The intrinsic evidence confirms the lack of clarity. The patents' descriptions of "ballistic" and "ballistic resistant" consistently use these words as high-level labels, never as rigorously defined terms with measurable content. For example, the '437 Patent (entitled "Bullet Proof Blinds") states that its slats "are adapted to be

resistant to penetration by high-speed ballistic objects" ('437 Patent, Abstract [Joint Appx. Ex. 1]; *see also id.* at 1:53–60), but nowhere specifies any quantitative threshold—such as a bullet's velocity or caliber—that must be resisted. The '437 Patent describes the blinds' slats as comprising "ballistic resistant material" like "Kevlar, Lexan, Tensylon, [or] boron-treated material" ('437 Patent, 6:65–67 (claim 9) [Joint Appx. Ex. 1]), but those examples simply enumerate well-known bullet-resistant substances without instructing how much of that material (or in what configuration) is required to ensure true ballistic resistance. Kevlar® fabric is bullet-resistant *only to a degree*, depending on its thickness, weave, and the threat level (e.g., a few layers may stop a low-velocity handgun round, but not a high-velocity rifle round). The patents, while mentioning some as discussed above, never require any specific performance standards or testing protocols (e.g., they do not require any specific National Institute of Justice (NIJ) ballistic rating, or any $V_0/V_{50}$ ballistic limit, or any measure of energy absorption capacity).

In short, the patents treat "anti-ballistic" and "ballistic resistant" as generic descriptors rather than limiting claim terms with clear boundaries, effectively leaving the exact degree of "resistance" to bullets undefined. This fails the definiteness requirement because a potential infringer or POSITA cannot tell with reasonable certainty what falls inside or outside the scope of the claim. The "anti-ballistic" and "ballistic resistant" limitations could be anything from a heavy steel

armor plate (clearly ballistic-resistant) to a lightweight plastic sheet that slows or stops only the smallest projectiles – and the patent provides no basis to draw the line. As the Federal Circuit has warned, if artisans must engage in guesswork to determine a claim's reach, the claim is indefinite. *Interval Licensing*, 766 F.3d at 1371–73.

Plaintiff's proposed "plain meaning" confirms the indeterminacy. Plaintiff argues that these terms have a straightforward ordinary meaning—namely, "configured to provide ballistic resistance." *See* Joint CC Br. at 24–27. But this proposed interpretation merely restates the claim language in noun form without providing any clearer objective criterion. Substituting "providing ballistic resistance" for "ballistic resistant" does not answer the core question: how resistant must the material or product be to qualify? In fact, Plaintiff's own explanation relies on "anti-ballistic" being an "unqualified term of art." *Id.* at 26. Thus, Plaintiff relies on the same conceptual (but undefined) notion of resisting penetration by high-speed projectiles that appears in the patents' specification—a description, not a definition. For a POSITA trying to apply these claims, that is insufficient: absent any metric or threshold, the plain meaning remains hopelessly subjective. *See Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1356 (Fed. Cir. 2005) (requiring a term that can be "objectively verified and do[es] not depend on a particular person's unfettered, subjective opinion").

Plaintiff notes that some embodiments use well-known ballistic materials like Kevlar®, but that observation actually underscores the indefiniteness. The patents provide no guidance on the amount or configuration of those materials needed to meet the claim's "ballistic" performance. That deficiency is critical: even if all parties agree that in general "ballistic" means related to projectiles, the law requires more than a mere intuitive or qualitative sense of a term's meaning. *See Halliburton*, 514 F.3d at 1256 (a qualitative term is indefinite when "it does not adequately distinguish" the degree of that term "of the invention from disclosed prior art"). Here, because the patents do not establish any measurable boundary for "anti-ballistic" or "ballistic resistant" materials compared to ones that are not, they effectively leave the invention's scope to "the unpredictable vagaries of any one person's opinion," *Datamize*, 417 F.3d at 1350, rendering the claims indefinite.

Prosecution history offers no cure. Nothing in the file histories of the '437, '070, or '905 families provides a clearer definition or disavowal that might narrow the metes and bounds of "anti-ballistic" or "ballistic resistant." The applicants used these terms generically during prosecution, without tethering them to any specific metric or standard of bullet-resistance. For example, the prosecution arguments never clarified what specific ballistic performance the claimed "anti-ballistic" materials must achieve. In short, the patentee did not even attempt to articulate a degree of ballistic resistance that the invention must possess—whether

defined in terms of known bulletproofing standards, ballistic testing results, or any other objective measure. The result is a claim that forces the public to speculate.

Because the patents nowhere indicate what it means for a material or barrier to be sufficiently "anti-ballistic" or "ballistic resistant," a skilled artisan cannot determine with reasonable certainty whether a given product falls inside or outside the scope of the claims. The terms are purely functional, describing a result ("resisting ballistic penetration") without limiting the invention to any quantitative threshold or structural requirement. Under *Nautilus* and Federal Circuit precedent, such indeterminate language renders the claims invalid for indefiniteness. *See Nautilus*, 572 U.S. at 901–02, 910; *Interval Licensing*, 766 F.3d at 1374. Plaintiff's proposed construction cannot rescue the claims, because an apparent meaning divorced from any objective standard does not satisfy the patent laws' requirement of clear claim boundaries. The Court should therefore hold that "anti-ballistic"/"ballistic resistant" are indefinite terms.

### 3. Plaintiff's Reply Position

Defendants contend these terms are indefinite because the patents do not specify an NIJ level, V50, caliber, or other numeric threshold. That argument confuses the absence of a number with the absence of meaning. Reasonable certainty

does not require a quantitative cutoff where the intrinsic record supplies a functional boundary and material exemplars.

Indefiniteness, in turn, asks only whether the claims inform a skilled artisan of the scope of the invention with reasonable certainty, not with mathematical precision, and any such challenge must be proven by clear and convincing evidence. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901, 910 (2014); *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017); 35 U.S.C. §§ 112(b), 282. Terms of degree are routinely held definite where the intrinsic record supplies examples or an objective baseline, and recent decisions in this District and the Federal Circuit confirm that hypotheticals and attorney argument cannot carry Defendants' burden. *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377–81 (Fed. Cir. 2017); *Samsung Elecs. Co. v. Tech. Consumer Prods., Inc.*, No. 1:23-CV-186 ("*Samsung*"), at *18–21 (D. Del. June 12, 2024); *Astellas Pharma Inc. v. Lupin Ltd.*, No. 23-819-JFB-CJB ("*Astellas*"), at *19–21 (D. Del. Oct. 30, 2024); *Indect USA Corp. v. Park Assist, LLC*, Nos. 2024-1023, 2024-1127 ("*Indect USA*"), at *11–13 (Fed. Cir. Jan. 7, 2026) (nonprecedential).

The claims define the property functionally, as a material or laminate "configured to prevent a ballistic object including a bullet and/or explosive shrapnel from penetrating" the laminate, *see, e.g.*, '905 Patent at cl. 1 (13:11) [Joint Appx. Ex. 7], and the specifications name the qualifying material families: Kevlar and other

aramids, Dyneema and other ultra-high-molecular-weight polyethylenes, Lexan, Tensylon, and boron-treated cloth. ’905 Patent at cls. 9–10 [Joint Appx. Ex. 7]; ’437 Patent at 5:27, 5:33–34 [Joint Appx. Ex. 1]. A skilled artisan reads “anti-ballistic” against this named universe of aramid and UHMWPE ballistic textiles, an objective anchor that supplies reasonable certainty. *Sonix*, 844 F.3d at 1377–81.

Defendants’ reliance on the patents’ permissive language is misplaced. That the laminates “might be certified to various standards of bullet-resistance,” or that it is “desirable that the blinds meet NIJ level IIIA standards or above,” shows the opposite of what Defendants claim: certification is an optional feature, not a claim limitation. ’905 Patent at 12:19–22 [Joint Appx. Ex. 7]; ’707 Patent at 19:59–60 [Joint Appx. Ex. 6]. Permissive embodiment language cannot be converted into a mandatory requirement. *Liebel-Flarsheim*, 358 F.3d at 906–08. Defendants effectively ask the Court to graft a testing-protocol requirement onto the claims, an importation of limitations, not claim construction.

Defendants’ own authorities confirm the point. *Interval Licensing* addressed the subjective phrase “unobtrusive manner,” and *Akamai* addressed the comparative superlatives “optimal” and “best route,” terms with no fixed physical referent. *Interval Licensing*, 766 F.3d 1364, 1370–71 (Fed. Cir. 2014); *Akamai Techs., Inc. v. MediaPointe, Inc.*, 159 F.4th 1370, 1379 (Fed. Cir. 2025). “Ballistic resistant,” by contrast, is a physical penetration-resistance property tied to a named class of

materials, not a subjective or comparative judgment. A functional property is definite where the specification supplies examples a skilled artisan can apply. *Samsung*, at 18–21; *Astellas*, at *19–21.

The extrinsic record confirms what the intrinsic record already establishes: a POSITA reads these terms with reasonable certainty. Mr. Ron Egres[2] testified that a

---

[2] Mr. Ron Egres, BBP's (possibly former) Chief Technology Officer, qualifies as a POSITA. He exceeds the relevant skill level presented in Plaintiff's opening claim construction brief. He is responsible for the "product design with respect to the ballistic resistance" of Defendants' infringing products and a named inventor on Defendants' own patent directed to an "anti-ballistic barrier," U.S. Patent No. 11,585,640. Deposition of Ron Egres ["Egres Tr."] at 6:13–9:12, 71:14–72:5 [Joint Appx. Ex. 15]. He authenticated his resume as accurate, testified that he has "almost 20 years" of experience with ballistic-resistant materials, and testified that he has approximately 15 years of experience with flexible armor systems. Egres Tr. 10:2-10, 10:12-24, 11:10-18 [Joint Appx. Ex. 15]. He further testified that he was hired at DuPont "for development," *id*. 13:11-23 [Joint Appx. Ex. 15], that his responsibilities at BBP included product design, testing, and material selection for ballistic resistance, *id*. 8:11-25, 9:2-12 [Joint Appx. Ex. 15], and that he has "more than ordinary skill in the art of ballistic barrier systems," *id*. 23:1-7 [Joint Appx. Ex. 15]. His resume likewise reflects advanced engineering degrees, technical leadership in DuPont's Kevlar applications research, ballistic impact testing, lamination, textile technology, and stitch-bonding, all of which place him well above the undisputed POSITA threshold. [Joint Appx. Ex. 23]. This is therefore not testimony from a lay corporate witness speculating about patent language; it is testimony from a highly qualified technical witness whose background far exceeds the level of ordinary skill relevant to claim construction.

Mr. Egres's testimony is also directly relevant because it addresses exactly how a skilled artisan would understand the disputed technical terms in context. For example, he testified that terms concerning ballistic resistance when he began his work in 2003, when he had ordinary skill in the art, would not have a different meaning today. Egres Tr. 43:3-14, 74:14-25 [Joint Appx. Ex. 15]. Mr. Egres confirms that the terms Defendants claim as indefinite are ordinary technical

POSITA encountering an "anti-ballistic barrier system" "would clearly see it was made to stop a projectile." Egres Tr. 74:14–25 [Joint Appx. Ex. 15]. He defined "anti-ballistic" as, "[b]asically something that would stop projectile threats," Egres Tr. 72:6–11 [Joint Appx. Ex. 15], and "ballistic penetration resistance" as "[t]he ability to impede the passage of a projectile through … [a] protective barrier," Egres Tr. 43:3–10 [Joint Appx. Ex. 15] (discussing [Joint Appx. Ex. 24]). He confirmed that Defendants' patent is in "the same field" as the patents-in-suit, with "parallels for its application for sure." Egres Tr. 72:17–73:1 [Joint Appx. Ex. 15]. And years before this litigation, Mr. Egres used the term as ordinary engineering vocabulary in his own technical reports, describing the development of "anti-ballistic structures" and the depletion of "antiballistic material" along a projectile's path. Stitch-Bonded Kevlar® Fabric Consolidated Ply Structure (CPS) for Military Body Armor Applications at 2, 9 [Joint Appx. Ex. 18]. That Defendants' own officer used these terms as settled vocabulary, and not a litigation artifact, is fatal to their indefiniteness theory. Defendants' own patent provides the similar disclosure of "a flexible anti-ballistic material generated from para-aramid or ultra high molecular weight

---

concepts with ascertainable meaning in the art, making his testimony directly relevant to both claim construction and Defendants' indefiniteness arguments.

polyethylene (UHMWPE) fiber" as the basis for its claimed anti-ballistic barrier, also without requiring a specific certification. [Joint Appx. Ex. 25 at 7:45-47].

Technical literature further confirms the same understanding across the field. A leading treatise characterizes ballistic threats by reference to projectile caliber, mass, velocity, and energy, and matches protective materials to those threats, explaining, for example, that three plies of Kevlar fabric suffice to stop a 0.38 caliber handgun round. Roy C. Laible, *Fibrous Armor*, in *Ballistic Materials and Penetration Mechanics* 87–88, tbl. 2 (1980) (hereinafter "Laible") [Joint Appx. Ex. 19]. That the field evaluates ballistic resistance against defined threats, rather than by a single universal number, is precisely why the absence of one mandatory certification level does not render the term unknowable; it is a comparative engineering property a skilled artisan applies with reasonable certainty. *Sonix*, 844 F.3d at 1377–81. Even Mr. Egres acknowledged that a POSITA would understand the specific threat requirements, say resisting a projectile from a tank versus a handgun, would inform the level of ballistic resistance demanded, as is done in the present patents. Egres Tr. 63:19-66:5 [Joint Appx. Ex. 15].

Plaintiff's construction, the plain meaning "configured to provide ballistic resistance," should be adopted.[3]

---

[3] Should the Court wish to address Defendants' "circularity" rhetoric, Plaintiff submits that it is agreeable to inserting the parties' agreed-upon definition of

### 4. Defendants' Sur-Reply Position

Plaintiff argues that providing example materials in the specification is sufficient to provide objective boundaries for the term "anti-ballistic." But Plaintiff's own cited case warns that its "holding … does not mean that the existence of examples in the written description will always render a claim definite, or that listing requirements always provide sufficient certainty." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1380 (Fed. Cir. 2017). Instead, "whether a claim is indefinite must be judged 'in light of the specification and prosecution history' of the patent in which it appears." *Id.* at 1381.

Here, the prosecution history shows that providing example materials alone is insufficient. In response to a rejection based on U.S. Patent No. 6,125,905 ("Woodside"), which disclosed the use of aramid fibers in a protective window covering comprising impact and puncture resistant fabric, applicant argued that "[t]he mere use of the [aramid] material is not sufficient to provide such capability [to stop a bullet] in the finished product" because "it must be sufficiently deployed and arranged in the proper proportions to do so." '070 Patent File History, Pre-Appeal Brief Review Remarks dated August 15, 2022 at 4 (p. 80 of 277) [Joint Appx.

---

"ballistic" as "relating to projectiles" into Plaintiff's definition of anti-ballistic/ballistic resistant. However, Plaintiff maintains the proposed construction is sufficient for the understanding of the terms.

Ex. 13]. The applicant further argued that there was "no discussion of the thickness of those [aramid] fibers." *Id.*[4] This conclusively shows that disclosing example materials does not disclose boundaries for what qualifies as anti-ballistic.

Moreover, applicant argued during prosecution that "objects thrown by storms having high winds," such as "a 9 lb., rigid, two-by-four board traveling at 50 fps," are not ballistic. *Id.* at 2 (p. 78 of 277). But such objects are clearly projectiles, and the parties have agreed that ballistic should be defined as "relating to projectiles." Applicant's own prosecution argument proves the problem: the same material is "anti-ballistic" or not depending on projectile energy and configuration. That leaves a skilled artisan with no objective boundary for the term. In short, the intrinsic record "does not adequately distinguish the [anti-ballistic nature] of the invention from disclosed prior art." *Halliburton Energy Servs. v. M-I LLC*, 514 F.3d 1244, 1256 (Fed. Cir. 2008).

Plaintiff's extrinsic evidence confirms the problem. Dr. Egres explained that anti-ballistic "can mean a variety of things," including scenarios involving "bullet resistance," "blast debris resistance," and "hurricane applications." Egres Tr. 73:8–

[4] Applicant also argued that Woodside was not anti-ballistic because its strands were spaced apart, *id.* at 2 (p. 78 of 277), but applicant ignored Woodside's teaching that the strands "can be positioned next to each other" instead of spaced apart. Woodside, 6:31–33 [Joint Appx. Ex. 14].

74:2 [Joint Appx. Ex. 15]. Whether a laminate is anti-ballistic depends on the ballistic threat, including:

- projectile type, [Joint Appx. Ex. 19 at 87–88] (requiring a second nine-ply vest for certain calibers);
- shot pattern, [Joint Appx. Ex. 18 at 7] (BBPI_002168) ("[T]he soft armor design approaches described above are both threat and test method dependent. Shot pattern and shot proximity can dramatically influence the reported V50.");
- shot proximity, *id.*;
- projectile velocity, [Joint Appx. Ex. 16 at 13] (showing ballistic performance dropping drastically above critical velocity);
- projectile size, [Joint Appx. Ex. 17 at 6] (BBPI_005047) (testing performance of panels compared to small, medium, and large fragments);
- shot angle, *id.* (testing performance of panels at different degrees of obliquity); and
- environmental conditions, *id.* (testing performance of panels at wet and dry conditions).

At the same time, "improv[ing] performance against one threat can influence the performance against others." [Joint Appx. Ex. 18 at 5] (BBPI_002166).

Thus, what is anti-ballistic in one scenario is not in another. This is the same problem discussed in *Halliburton Energy*, 514 F.3d at 1254–55. There, "a wide variety of factors could affect adequacy (formation geology, well-bore size, depth, angle, etc.)" of a certain drilling fluid to suspend drill cuttings in different formations and well configurations. *Id.* As such, "a given fluid might be adequate to suspend drill cuttings in some formations and/or well configurations, whereas in others it would not be," which would require "a separate infringement determination for every set of circumstances in which the composition may be used," with each determination "likely to result in differing outcomes (sometimes infringing and sometimes not)." *Id.* at 1255. As a result, the term was indefinite. *Id.* So too here: whether a given covering is anti-ballistic will depend on a set of circumstances (caliber, shot distance, angle, velocity, pattern, environmental conditions, etc.) that will result in differing infringement outcomes.

Whether anti-ballistic can be readily defined or used by an expert does not resolve the correct inquiry. *Sonix Tech.*, 844 F.3d at 1380–81 (whether "an expert has applied a contested claim term without difficulty" does not resolve whether a term is indefinite); *Horizon Pharma, Inc. v. Reddy's Labs. Inc.*, 839 F. App'x 500, 504 (Fed. Cir. 2021) (non-precedential) (affirming finding of indefiniteness even though the claim term "is a commonly understood word"). The correct inquiry is whether the claim "inform[s] those skilled in the art about the scope of the invention

with reasonably certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). Although mathematical precision is not required, "claims, when read in light of the specification and the prosecution history, must provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370–71. Here, that standard is not met. The terms "anti-ballistic" and "ballistic resistant" are indefinite.

### C. "decorative"

| Claim Term | Plaintiff's Construction | Defendants' Construction |
| --- | --- | --- |
| "decorative" | No construction required, or alternatively, aesthetically appearing. | Indefinite |

#### 1. Plaintiff's Opening Position

No construction of "decorative" is necessary. The term is a common English word with a plain and well-understood meaning that a lay juror would grasp without assistance: relating to visual or aesthetic appearance rather than to structural or functional performance. The patents use "decorative" in exactly this ordinary sense throughout, and nowhere suggest that it carries any special or technical meaning.

The figures across the three patents depict "decorative" layers consistently as outer surface layers, distinct from the inner anti-ballistic layers they enclose. Figure 7 of the '070 Patent and '872 Patent shows the laminated slat 400 with decorative

layers 410 and 430 as the outermost surfaces flanking inner ballistic layer 420. Figure 7A depicts decorative top layer 452 as the visible outer surface of laminate 450.




Fig. 7A




*FIG. 7*

In the '905 Patent, Figures 3 and 4 depict outer decorative layers 107 and 108, respectively, as the surface layers of laminates 105 and 109. In every instance, the depicted "decorative" layer occupies the outermost position (the position visible to an observer) consistent with the plain meaning of the term as relating to aesthetic appearance.




Figure 3




Figure 4

The specifications reinforce this plain meaning by consistently using "decorative" in contrast with functional or structural attributes. In the '070 Patent and '872 Patent, the specification explains that laminates "can be made in this laminated manner to provide both decorative and anti-ballistic features," pairing the term directly against the functional property of ballistic resistance. '070 Patent, col. 18, ll. 23–24 [Joint Appx. Ex. 2]. Elsewhere, the specification notes that "[d]ecorative layers or paints can be provided for room esthetics," glossing the term's meaning in plain language: aesthetic appearance suited to a room environment. '070 Patent, col. 9, ll. 23–24 [Joint Appx. Ex. 2]. Similarly, the specification contrasts "decorative purposes" with "physical support" when describing edge binding, confirming that "decorative" relates to appearance. '070 Patent, col. 18, ll. 44–47 [Joint Appx. Ex. 2].

The '905 Patent is equally clear. It states that "the final, outer layers may be solely for decorative purposes, with no anti-ballistic properties," and that "the outer layers might be made decorative or paintable." '905 Patent, col. 8, ll. 56–58; col. 8, ll. 54–55 [Joint Appx. Ex. 7]. The equation of "decorative" with "paintable," and the contrast with layers having "anti-ballistic properties," confirms the term's meaning: a layer serving an aesthetic, visual function rather than a protective or structural one. The '905 Patent further describes outer decorative layers as added to provide "a decorative outer surface on the laminate." '905 Patent, col. 11, ll. 16 [Joint Appx. Ex. 7]. No technical expertise is needed to understand what an "outer surface" made "decorative" means.

Because "decorative" carries a plain meaning that is both well-understood by lay persons and consistently used in its ordinary sense throughout the specifications, no construction is required.

**2. Defendants' Answering Position**

The term decorative is simply indefinite. Plaintiff misses the point when it insists that the term has "a plain meaning that is [] well-understood by lay persons." Joint CC Br. at 47. The correct inquiry is not whether one can define the term. Instead, it is whether the term "inform[s] those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus*, 572 U.S. at 910. The term decorative is too subjective to provide such reasonable certainty, and the patents fail

to provide "objective boundaries for those of skill in the art." *Interval Licensing*, 766 F.3d at 1371.

Here, the intrinsic record confirms that "decorative" is used in a purely subjective, aesthetic sense without any articulated standard. The specification merely labels certain layers as "decorative" to distinguish them from ballistic or structural components, but provides no criteria (functional, structural, or otherwise) for determining when a layer qualifies as "decorative." *See* '707 Patent at 18:21–29 [Joint Appx. Ex. 6]. Nor do the claims supply any additional guidance. The result is a term that depends entirely on individual perception rather than any objective measure tied to the invention.

Federal Circuit precedent makes clear that such subjective language renders claims indefinite when the intrinsic record fails to cabin the term's scope. In *Datamize*, for example, the Federal Circuit held that "aesthetically pleasing" was indefinite because it was "completely dependent on a person's subjective opinion" and lacked "objective anchor[s]" in the patent. 417 F.3d at 1350–51. Likewise, in *Interval Licensing*, the court found "unobtrusive manner" indefinite where the term is "highly subjective" and the patent provided no standard for measuring when a display was unobtrusive, emphasizing that the claims must supply "objective boundaries." 766 F.3d at 1370–74.

"Decorative" suffers from the same defect. Whether a layer is "decorative" turns on subjective aesthetic judgment. Indeed, what appears decorative to one observer may not to another. Similarly, what one person uses, intending to be decorative, may be used by another without any such intention. And the patents provide no guidance to resolve that variability. Plaintiff's fallback construction, "aesthetically appearing," only underscores the problem; it substitutes one subjective formulation for another without supplying the required objective criteria.

Because the patents fail to provide any standard by which a POSITA could determine the scope of "decorative" with reasonable certainty, the term is indefinite under *Nautilus*. *See* 572 U.S. at 910.

**3. Plaintiff's Reply Position**

"Decorative" is not the subjective, taste-based term Defendants portray. The patentee used it as a structural classification defined by location and function: an "outer decorative layer … provided on an outer surface" of the laminate, comprising "an outer layer that does not provide anti-ballistic properties," placed so as to be "in view of an observer using the product." '905 Patent at cls. 26, 30 [Joint Appx. Ex. 7]; see '707 Patent at 18:21–29 [Joint Appx. Ex. 6]. The decorative layer is identified by where it sits in the stack and what it is not required to do (provide ballistic protection) not by any aesthetic value judgment. The shared specification confirms the point, glossing "[d]ecorative layers or paints" as those "provided for room

esthetics" and contrasting "decorative" layers against those serving "protection." '707 Patent at 18:23–29 [Joint Appx. Ex. 6]. In other words, the "decorative" layer is the layer that a user can see when the blind is deployed. Nothing further concerning any subjective criteria is required.

*Datamize* is inapposite. "Aesthetically pleasing" required a judgment about quality, leaving scope to "the unpredictable vagaries of any one person's opinion." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir. 2005). Identifying which layer faces the observer and may lack ballistic function demands no such judgment; it is answered by the layer's position and properties, both objective. Where the intrinsic record supplies that kind of anchor, a term is not indefinite merely because it could, in the abstract, invite differing tastes. *Sonix*, 844 F.3d at 1378–79; see *Astellas* at *20. No construction of the term is required.

**4. Defendants' Sur-Reply Position**

Plaintiff argues that the term decorative is defined by location and function rather than being subjective. But this argument flies in the face of its own fallback construction: "aesthetically appearing." Moreover, Plaintiff's argument contradicts the specification and violates claim construction principles. Rather than equating the outer layer to a decorative layer, the common specification indicates that not all outer layers are decorative: "[O]ptional outer layers 410 and 430 provid[e] protection and/*or* decorative layers." '070 Patent at 5:63–64 (emphasis added) [Joint Appx. Ex.

2]; *see also id.* at 15:28–29. And the specification repeatedly uses the term decorative in the subjective sense. *Id.* at 7:12 ("provide decorative features"), 9:23–24 ("Decorative layers … provided for room esthetics"), 15:20–21 ("decorative in nature to be pleasing aesthetically"), 18:23–24 ("to provide [] decorative … features"), 18:46 ("for decorative purposes").

The '905 patent similarly indicates that not all outer layers are decorative: "[T]he outer layers might be made decorative" for "esthetics of the end product." '905 Patent at 8:54–56 [Joint Appx. Ex. 7]. And the '905 patent repeatedly uses the term decorative in the subjective sense. *Id.* at 8:54–56 (discussing layers "made decorative" for "flexibility in the esthetics"), 8:56–58 ("decorative purposes"), 8:61–62 ("decorative for aesthetic reasons"), 9:23–24 ("decorative purposes"). Thus, the specifications contradict Plaintiff's position that decorative is not subjective and merely refers to any outer layer.

Moreover, Plaintiff's position violates the principle of claim differentiation. For example, claim 19 in the '574 Patent recites a "different outer layer" while its dependent claim 20 specifies that "the at least one different layer is a decorative layer." '574 Patent at claims 19–20 [Joint Appx. Ex. 4]. If decorative simply means an outer layer, then claim 20 is no different in claim scope than its independent claim 19, which already specifies the different layer as an outer layer. *See Hill-Rom Servs. v. Stryker Corp.*, 755 F.3d 1367, 1376 (Fed. Cir. 2014) ("Under the principles of

claim differentiation, the independent claims are presumed to be broader."); 35 U.S.C. § 112(d) (requiring a dependent claim to "specify a further limitation of the subject matter claimed"). In addition, multiple claims recite both "outer" and "decorative" ('872 Patent at claim 6 [Joint Appx. Ex. 3]; '574 Patent at claim 10 [Joint Appx. Ex. 4]; '575 Patent at claims 6, 18 [Joint Appx. Ex. 5]; '707 Patent at claims 1, 16, 27, 29 [Joint Appx. Ex. 6]), and Plaintiff's position would improperly render one of these terms superfluous. *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 810 (Fed. Cir. 2021) ("It is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous."); *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950–51 (Fed. Cir. 2006).

The term "decorative" is indefinite.

### D. "feeding a continuous length"

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "feeding a continuous length" | supplying an elongated length | supplying an unbroken, elongated length of material into the process (for example, from a roll), as opposed to supplying discrete or pre-cut sections |

#### 1. Plaintiff's Opening Position

The term "feeding a continuous length" should be construed as "supplying an elongated length." The parties do not dispute that the term should be construed as "supplying" and an "elongated length." The '905 Patent specification describes a

manufacturing process in which long sheets of anti-ballistic material are supplied into a bonding process to produce a laminate, and the specification makes plain that the relevant attribute of the input material is its elongated character, but not the specific manner in which it is supplied or whether it arrives from a roll versus directly from a prior processing station.

Figure 8 of the ‘905 Patent illustrates the claimed feeding step, depicting rolls of material 211, 213, 215 supplying continuous lengths of material 221, 223, 225 into Laminate Bonding Process 230 to produce bonded laminate 240.




*Figure 11*

The specification describes the manufacturing process as one in which “[m]ultiple rolls of material (e.g., continuous sheets or laminates), 211, 213, 215…are provided each having material 221, 223, 225, respectively, rolled thereon” and “continuously fed into a Laminate Bonding Process 230.” ‘905 Patent, col. 9, ll. 55–65 [Joint Appx. Ex. 7]. Immediately after, the specification describes an

alternative in which "the laminate 240 could be fed directly into another process (without rolling) for further processing and/or making into finished components or finished goods in a continuous process." '905 Patent, col. 10, ll. 9–12 [Joint Appx. Ex. 7]. The specification thus explicitly contemplates "feeding" without the use of a roll at all. The material passes directly from one processing station to the next. Plaintiff's construction properly encapsulated the full scope of the claimed process.

**2. Defendants' Answering Position**

The intrinsic record makes clear that "feeding a continuous length" refers to supplying an unbroken, elongated length of material into a continuous manufacturing process, not merely providing any elongated piece of material. Plaintiff's construction improperly reads "continuous" out of the claim and disregards the process-oriented context in which the term is used.

The claims themselves confirm that the invention is directed to continuous production, requiring "feeding a continuous length of a first sheet of material … into a bonding process" and then "bond[ing] … to form said continuous length of flexible ballistic resistant laminate." '905 Patent at 13:1–11 [Joint Appx. Ex. 7]. This repeated coupling of "feeding" with "continuous length" and a downstream bonding process reflects an uninterrupted, input-to-output manufacturing flow, not a series of discrete operations on individual pieces.

The specification reinforces that understanding by framing the invention as solving a mass-manufacturing problem. It explains that "an efficient and scalable method of manufacturing … that is easily utilized in mass manufacturing operations of the end-products … is needed." '905 Patent at 1:38–43 [Joint Appx. Ex. 7]. Consistent with that objective, the disclosure emphasizes that the laminates are produced in **"**long lengths to support mass manufacturing of the end products.**"** *Id.* at 1:51–54.

Critically, the detailed description removes any doubt about the scale and form of the recited "continuous length." It explains that the process produces laminates in "long lengths (dozens, scores, hundreds, or thousands of feet)" that are then "rolled or otherwise transported or fed for use in subsequent manufacturing into the desired end products." *Id.* at 3:36–43, 4:4–14. This disclosure reflects a roll-to-roll manufacturing paradigm, not the handling of discrete, pre-cut segments. A process that feeds individual pieces, such as fabricating one window blind at a time in a batch process, cannot satisfy this requirement of supplying material in elongated lengths of such magnitude.

The figures and accompanying discussion underscore the same point. Figures 8–11 depict continuous feed systems in which multiple rolls of material are "continuously fed" into a bonding process to form a laminate that is itself wound onto a roll or fed directly into further processing. '905 Patent at 9:53–11:27 [Joint

Appx. Ex. 7]. These figures illustrate classic continuous manufacturing, where material flows through successive stations in an unbroken stream, rather than being introduced and processed as discrete units.

This continuous-feed approach is fundamentally different from a batch process, in which individual, pre-cut sections are supplied and processed separately. The intrinsic record makes clear that the invention is directed to enabling efficient, large-scale production of long laminate sheets that are later converted into finished products (e.g., by cutting into slats or panels), rather than manufacturing those products one-by-one. '905 Patent at 4:4–14, 10:34–45 [Joint Appx. Ex. 7].

Plaintiff's construction ("supplying an elongated length") ignores this context and would improperly encompass the feeding of short, discrete pieces—precisely the type of batch operation the patent supplants. By eliminating the requirement that the material be unbroken and continuously supplied, Plaintiff's construction fails to give effect to the word "continuous," contrary to *Phillips*.

Defendants' construction, by contrast, is faithful to the claim language and the specification's repeated emphasis on continuous, roll-based, mass-manufacturing processes using very long material lengths. It properly captures that "feeding a

continuous length" requires an uninterrupted feed of material (e.g., from a roll), as opposed to discrete or pre-cut sections.[5]

Accordingly, the Court should construe "feeding a continuous length" to mean "supplying an unbroken, elongated length of material into the process (e.g., from a roll), as opposed to supplying discrete or pre-cut sections."

**3. Plaintiff's Reply Position**

~~Plaintiff does not dispute that "continuous length" means an elongated, continuous sheet fed into the process rather than discrete, pre-cut pieces. The dispute is narrow: Defendants' negative gloss, "as opposed to supplying discrete or pre-cut sections," threatens to exclude a disclosed mode of continuous feeding, namely feeding directly from upstream processing rather than from a roll.~~

~~The specification forecloses that exclusion. It teaches that "the roll 250 might be avoided if the laminate 240 is fed directly into the station 235," and that where "the laminate is too thick to roll onto a roll 265, it may be fed directly from a prior process forming the laminate." '905 Patent at 10:27–28, 12:7–9 [Joint Appx. Ex. 7]. Defendants concede that their construction "does not require that the material be supplied in the form of a roll," yet their "discrete or pre-cut sections" gloss, read~~

[5] Defendants' construction does not require that the material be supplied in the form of a roll. It simply requires that an unbroken, elongated length be supplied into the process, as opposed to supplying discrete, pre-cut sections.

~~against "continuous," would still exclude this disclosed roll-less, direct-feed mode. A construction that reads out a disclosed embodiment is disfavored. *Liebel-Flarsheim*, 358 F.3d at 906–08; *Indect USA*, at *10.~~

~~Mr. Egres confirms the ordinary understanding. Describing the continuous roll-good process, he explained that the technology would "generate a multiple woven fabric ply" that a downstream manufacturer would "roll … out, cut out the best shapes" as needed. Egres Tr. 44:22–45:9 [Joint Appx. Ex. 15]. The continuous web is fed and bonded as an uninterrupted length; cutting into discrete sections happens downstream and does not defeat the "continuous" character of the feed. That is precisely the distinction Plaintiff's construction preserves and Defendants' gloss blurs.~~

~~Plaintiff's construction of "supplying a continuous, elongated length of material into the process" gives "continuous" full effect while preserving every disclosed feeding mode.~~

[Text removed by Plaintiff as set forth in the letter filed July 31, 2026.]

#### 4. Defendants' Sur-Reply Position

It is not clear what is left in dispute for this claim term. Plaintiff expressly stated that it "does not dispute that 'continuous length' means an elongated, continuous sheet fed into the process rather than discrete, pre-cut pieces." This is exactly what Defendants' proposed construction states. Although Plaintiff alleges

that the phrase "'as opposed to supplying discrete or pre-cut sections[]' threatens to exclude a disclosed mode of continuous feeding," Plaintiff does not explain how it does so. The Court should thus adopt Defendants' proposed construction.[6]

### E. "laminate"; "laminated sheet"

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "laminate"; "laminated sheet" | "laminate": multiple layers arranged in a stack<br><br>"laminated sheet": sheet comprising multiple layers arranged in a stack | multiple layers joined or bonded together so that they function as a single material or layer |

#### 1. Plaintiff's Opening Position

The terms "laminate" and "laminated sheet" appear across six of the seven asserted patents. "Laminate" should be construed as "multiple layers arranged in a stack" and "laminated sheet" as "sheet comprising multiple layers arranged in a stack." Both constructions are supported by the claims, specifications, and figures of the six asserted patents in which they appear.

---

[6] Defendants propose to remove their sur-reply for this term if Plaintiff's reply is removed as requested by Plaintiff. This is not due to any error made by Defendants; the removal is requested because Defendants' sur-reply solely responds to Plaintiff's reply.

The specifications shared across the '070, '872, '574, '575, and '707 Patents use the word "stacked" as the operative descriptor for what a laminate is. Describing the fabrication of the anti-ballistic laminate shown in Figure 7A, the specification explains that "18 layers of level 3A bullet proof material…can be stacked into a laminate that can be glued, heat welded, or stitched…to secure the layers together."




'070 Patent, col. 18, ll. 37-40 [Joint Appx. Ex. 2].

In other words, layers are first stacked to form the laminate, and then secured. Stacking defines the laminate; securing is a separate act performed upon the pre-existing stack. The '905 Patent uses identical language, describing the manufacturing method as one in which the desired layers "are rolled out and stacked

and fixed (bonded) together." '905 Patent, col. 5, ll. 19–22 [Joint Appx. Ex. 7]. Both formulations confirm that "laminate" means multiple layers arranged in a stack.

The claims of the '070 and '872 Patents provide the most direct evidence for the meaning of "laminated sheet." Independent claims 1, 18, and 20 of each patent recite barriers comprising "layers…stacked on top of each other…secured together into a flexible laminated sheet." '070 Patent, cls. 1, 18, 20 [Joint Appx. Ex. 2]; '872 Patent, cls. 1, 18, 20 [Joint Appx. Ex. 3]. The claims themselves thus equate a "laminated sheet" with layers that are stacked on top of each other, directly tracking Plaintiff's proposed construction. The '574, '575, and '707 Patents similarly describe barriers formed from "sheets…laminated together into a flexible laminate," using "stacked" and "laminate" interchangeably to describe the same layered structure. See, e.g., '575 Patent, col. 18, ll. 43-45, cl. 15 [Joint Appx. Ex. 5]; '707 Patent, col. 18, ll. 43-45, cl. 1 [Joint Appx. Ex. 6].

The '905 Patent's description of its manufacturing process further confirms that "laminate" describes a stack of discrete layers rather than a fused single material. The specification describes multiple materials being "continuously fed into a Laminate Bonding Process" and lists bonding methods including "gluing; stitching; spot welding; arc welding; RF welding; flame lamination; riveting" and hook-and-loop fastening. These methods attach discrete layers together rather than fusing them into an undifferentiated mass. '905 Patent, col. 5, ll. 20–28 [Joint Appx. Ex. 7]. The

diversity of these methods, and the fact that mechanical fasteners such as rivets and hook-and-loop connectors are expressly contemplated, confirms that the layers in a "laminate" retain their individual character after assembly.

### 2. Defendants' Answering Position

Several asserted claims require a "laminate"[7] or a "laminated sheet."[8] Plaintiff argues that this language simply means multiple layers arranged in a stack (or a sheet comprising multiple layers). But this argument is contrary to the plain and ordinary meaning of the noun "laminate," contradicts the claim language and is not supported by the specification. In short, after consistently using this term to delineate its own invention, Plaintiff now seeks to read this term out of all claims. In contrast, Defendants' proposed construction (multiple layers joined or bonded together so that they function as a single material or layer) gives the correct meaning to this term.

The plain meaning of a laminate is more than simply a stack of multiple layers. Instead, a laminate is "a product made by laminating." *Merriam-Webster's*

---

[7] *See, e.g.*, '070 Patent at claim 18 (21:33–34), claim 20 (22:20–21) [Joint Appx. Ex. 2]; '872 Patent at claim 1 (20:25), claim 15 (21:40), claim 26 (22:52) [Joint Appx. Ex. 3]; '575 Patent at claim 15 (21:50), claim 24 (22:48) [Joint Appx. Ex. 5]; '707 Patent at claim 16 (21:35), claim 27 (22:25), claim 29 (22:49) [Joint Appx. Ex. 6]; '905 Patent at claim 1 (13:11), claim 22 (14:42), claim 26 (15:18), claim 28 (15:41), claim 30 (16:19) [Joint Appx. Ex. 7].

[8] '070 Patent at claim 1 (20:22), claim 18 (21:37), claim 20 (22:25) [Joint Appx. Ex. 2].

*Collegiate Dictionary* (11th ed. 2003) at 698 [Joint Appx. Ex. 20]. And the verb laminate means "to *unite* (layers of material) by an adhesive or other means." *Id.* (emphasis added). Defendants' construction aligns with this definition: "multiple layers joined or bonded together so that they function as a single material or layer." The intrinsic record supports this very construction.

First, the claim language, in context, confirms Defendants' construction. For example, in the '070 patent, the claims already recite "a plurality of layers … stacked on top of each other." *See* '070 Patent at 20:19–21 [Joint Appx. Ex. 2]; *see also id.* at 21:33–37, 22:20–25. Thus, the term "laminate" and "laminated sheet" must mean something more than multiple layers arranged in a stack because otherwise the term "laminate" and "laminated sheet" would be rendered superfluous. This is contrary to black-letter law that "claims are interpreted with an eye toward giving effect to all terms in the claim." *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) (citing cases) ("Allowing a patentee to argue that physical structures and characteristics specifically described in a claim are merely superfluous would render the scope of the patent ambiguous ….").

Other patents in the family similarly show that the claims already recite multiple layers. For example, the '872 patent recites "the ballistic barrier comprised of a plurality of sheets." '872 Patent at 20:23–24, 21:38–39, 22:49–50 [Joint Appx. Ex. 3]. The other patents include similar language. '574 Patent at 20:24, 22:4, 22:44

[Joint Appx. Ex. 4]; ’575 Patent at 21:46–47, 22:42–43 [Joint Appx. Ex. 5]; ’707 Patent at 20:23–24, 21:31–32, 22:21–22, 22:45–46, 23:1–2 [Joint Appx. Ex. 6]. The term “laminate” must add something. Under the plain and ordinary meaning, laminate adds that the layers are joined or bonded together so they function as a single material or layer.

Turning to the ’905 patent, it likewise has claim language that confirms laminate means more than simply multiple layers arranged in a stack. Specifically, it recites feeding multiple sheets of material “into a bonding process” and using the “bonding process to bond” the sheets of material to form the laminate. ’905 Patent at 13:1–11, 14:31–42, 15:3–18, 15:33–41, 16:11–20 [Joint Appx. Ex. 7]. Thus, based on the claim language itself, laminate means more than a stack of multiple layers. Instead, the term “laminate” means multiple layers joined or bonded together so that they function as a single material or layer.

The specifications confirm that a “laminate” requires the layers to be joined into a unified structure, not merely stacked. For example, the ’070 patent explains that the laminate “includ[es] a plurality of layers … with all said layers being secured together into a flexible sheet.” ’070 Patent at 3:35–38, 3:49–52 [Joint Appx. Ex. 2]. That description of a laminate reflects more than the presence of multiple layers. It reflects their integration into a cohesive material: “a flexible sheet.” *Id.*

The same understanding appears in the detailed description of how the laminate is formed and functions. The patent describes layers that are secured together through bonding processes so that the resulting structure operates as a single sheet or material, rather than as independent layers. '070 patent at 6:18–30 [Joint Appx. Ex. 2]. Notably, the patent also states that the blinds may be made of "a uniform material that … use[s] one or more uniform layers of ballistic material, which *may or may not be laminated*." *Id.* at 15:3–6 (emphasis added). Plaintiff's proposed construction cannot be squared with this teaching. If laminated simply means a stack of multiple layers, there would be no way for the blinds to be made of multiple layers without being laminated, but the patents expressly contemplate such a situation. *See id.*

Taken together, these passages confirm that the defining characteristic of a "laminate" in the intrinsic record is the joining or bonding of layers so that they function as a single material, consistent with Defendants' construction and incompatible with Plaintiff's attempt to equate a laminate with any mere stack of layers.

The specification in the '905 patent similarly shows this same meaning of laminate. Specifically, the '905 explains that the "laminated layers are desired to be formed into a cohesive structure by bonding them together in a manner that does not easily separate back into individual sheets." '905 Patent at 5:19–21 [Joint Appx. Ex.

7]. And the processes for accomplishing this "cohesive structure" are the same as those discussed in the other patents. *See id.* at 5:19–28; '070 Patent at 6:18–30 [Joint Appx. Ex. 2].

The Court should reject Plaintiff's attempt to broaden the meaning of "laminate" to be inconsistent with the intrinsic record. Rather, the Court should construe "laminate" and "laminated sheet" to mean multiple layers joined or bonded together so that they function as a single material or layer.[9]

**3. Plaintiff's Reply Position**

Defendants propose a single construction for all three terms: multiple layers "joined or bonded together so that they function as a single material or layer." The "function as a single material" gloss appears nowhere in the patents and is contradicted by the specification's own bonding disclosures.

The patents describe laminates bonded by methods that preserve the discrete identity of, and permit relative motion between, the constituent layers, yet still call the result a "laminate." Chain stitching is used precisely because it "allows material to stretch and move easier," as distinguished from "the more secure lock stitch"; a

---

[9] Defendants' position correctly requires the multiple layers to function as a single material or layer for the reasons already discussed. Defendants' position does not require "fusing them into an undifferentiated mass" as Plaintiff's strawman argument suggests. Joint CC Br. at ~~61~~60.

laminate "might be … stitched together using a rubber or other stretchable thread acting like a bungee cord"; and "[p]lastic or metal rivets can be punched into the laminate." '905 Patent at 7:18–23, 6:38–45, 6:24–27 [Joint Appx. Ex. 7]. A bungee-stitched, riveted, or chain-stitched stack does not "function as a single material," yet the patent calls each a laminate. Defendants' gloss cannot be squared with the very disclosures that define the term.

The claims independently refute the gloss. Dependent claims specify lamination "by sewing the plurality of sheets together" or "by using an adhesive to secure the plurality of sheets together," acts of stacking and fastening discrete layers, not fusing them into a monolith. '872 Patent at cls. 4–5 [Joint Appx. Ex. 3]; '707 Patent at cls. 8–9, 22 [Joint Appx. Ex. 6]; '575 Patent at cls. 16–17 [Joint Appx. Ex. 5]. Worse, Defendants' "single material" requirement manufactures a non-infringement theory by inviting a fact fight over shear and slip whenever the layers move relative to one another, the very "looseness, flexibility, and motion of the material" the patents identify as beneficial to energy absorption. '070 Patent at 8:53–57 [Joint Appx. Ex. 2]. Ordinary meaning governs; no lexicography redefines "laminate" as "monolithic." *Phillips*, 415 F.3d at 1314; *Thorner*, 669 F.3d at 1365.

Mr. Egres confirms that a laminate is a layered assembly of discrete plies, not a fused mass. Describing the multi-ply consolidated web of Improved Soft Body Armor Ballistic Resistance via Quilt-Consolidation (z-Connectors): Part II: Product

Testing & Manufacturing Feasibility [Joint Appx. Ex. 17], he explained that a purpose of the construction was "to keep plies in close proximity," "keeping plies relatively close and de-bulked," while the manufacturer would later "roll this material out, cut out the best shapes." Egres Tr. 44:22–45:15 [Joint Appx. Ex. 15]. Plies kept "in close proximity" remain plies; they do not become "a single material."

Additional extrinsic evidence confirms that the field uses these terms to describe multi-layer fabric assemblies secured together with bonding media while retaining their identity as plies or sheets. For example, the ballistic resistance of a nylon laminate was "due entirely to the 5 plies of nylon ballistic fabric, from which it is composed," and that resin was added "only for integrity," demonstrating that a laminate may consist of multiple distinct layers secured together without becoming an undifferentiated single material. Laible at 106 [Joint Appx. Ex. 19]. Likewise, an exemplary Kevlar laminate of "23 plies of a Kevlar 29 fabric" is combined with resin, and the laminate performance varies with factors such as resin content, fiber length, and areal density, again reflecting a layered assembly whose component sheets remain meaningful structural elements. *Id.* at 107-08 [Joint Appx. Ex. 19]. In this technical context, a laminate is understood as a composite of multiple layers secured together in a layered arrangement, not a monolithic body stripped of layer-by-layer character.

Defendants' reliance on the '905 Patent's reference to a "cohesive structure" does not change that result. '905 Patent at 5:19–21 [Joint Appx. Ex. 7]. In context, the layers are bonded or fastened together so the laminate holds together for intended handling and use; that does not mean the layers lose their identity or behave as an undifferentiated monolith. That is why the same patents contemplate stitching, chain stitching, rubber thread, and rivets, all of which retain layer-by-layer structure. The dictionary definition Defendants invoke is to the same effect, describing the uniting of layers "by an adhesive or other means"; it imposes no separate "single material" functional requirement.

Plaintiff's constructions are text-faithful: "laminate" means "multiple layers arranged in a stack and secured together (e.g., by adhesive, stitching, welding, or quilting)"; "laminated sheet" means "a sheet comprising multiple layers arranged in a stack and secured together"; and "laminated together" means "multiple layers stacked and secured together." Each gives "laminate" content beyond a bare stack, answering Defendants' superfluity objection, without importing a monolithic-function requirement the patentee never used.[10]

---

[10] During the assembly of this Joint Claim Construction Brief, Plaintiff was alerted that the wrong closing paragraph to Plaintiff's Reply Brief section on "laminate" and "laminated sheet" was inserted into the draft served on Defendants, which had different constructions for these terms. Plaintiff did not intend to change its proposed construction of these terms through this paragraph and maintains its

#### 4. Defendants' Sur-Reply Position

For the "laminate" terms, Plaintiff continues to attack a strawman. Defendants' construction does not require a fused monolith; it requires layers joined or bonded together so they function as a single material or layer—the ordinary meaning of "laminate." Plaintiff's shift from "multiple layers arranged in a stack" to "multiple layers arranged in a stack and secured together (e.g., by adhesive, stitching, welding, or quilting)" confirms that Plaintiff's original position is wrong.

Plaintiff's revised construction remains too broad. A stack of layers could be secured together without being united (as with papers stapled in a corner). But such a configuration would not be a laminate because laminating requires uniting layers. *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003) at 698 [Joint Appx. Ex. 20]. Defendants' construction captures that requirement by requiring layers "joined or bonded together so that they function as a single material or layer."

Plaintiff's extrinsic evidence does not support Plaintiff's position. Mr. Egres did not address "laminate" in the cited testimony, Egres Tr. 44:22–45:15 [Joint Appx. Ex. 15], and the document he discussed does not use the term [Joint Appx. Ex. 17]. Laible, meanwhile, supports Defendants' construction. It describes laminates as "fibers or fabrics in a plastic matrix." [Joint Appx. Ex. 19 at 73].

---

proposed construction identified above at this time.

Because those materials are molded together, *id.* at 107, they will function as a single layer or material. In contrast, Laible treats stitched or spot-bonded multilayer fabric (*id.* at 74) as "unlaminated fabrics." *Id.* at 107; *see also id.* at 74–90. Laible thus distinguishes layers merely secured together from a laminate.

Defendants' construction does not require a monolith or eliminate individual plies. It requires only that the layers function as a single material or layer, consistent with the ordinary meaning and intrinsic record.

### F. <u>“laminated together”</u>

| Claim Term | Plaintiff’s Construction | Defendants’ Construction |
|---|---|---|
| “laminated together” | multiple layers stacked and secured together | multiple layers joined or bonded together so that they function as a single material or layer |

#### 1. Plaintiff’s Opening Position

As addressed in “laminate” construction above, Defendants propose the same construction for “laminate,” “laminated sheet,” and “laminated together” alike. This conflation is error. “Laminated together” is a verb phrase that appears in the claims to describe the act of assembling multiple discrete sheets into a laminate and not the structural character of the resulting product. Its proper construction is “multiple layers stacked and secured together,” which captures the assembling action without importing the “single material” requirement that Defendants seek to read into all three terms.

The claims themselves define what “laminated together” means by specifying the methods by which the sheets are assembled. Dependent claims in the ‘872, ‘575, and ‘707 Patents recite that the plurality of sheets are “laminated together” either “by sewing the plurality of sheets together” or “by using an adhesive to secure the plurality of sheets together.” *See, e.g.*, ‘872 Patent, cls. 4–5 [Joint Appx. Ex. 3]; ‘707 Patent, cls. 8–9 [Joint Appx. Ex. 6], 22; ‘575 Patent, cls. 16–17 [Joint Appx. Ex. 5]. Sewing sheets together and adhesively securing them are plainly acts of stacking and fastening discrete layers, but not fusing them into a single undifferentiated material.

The claim language thus provides its own definition of "laminated together" that is inconsistent with Defendants' proposed construction.

The specification confirms this understanding. It describes the act of assembling layers as stacking them and then securing them: "18 layers…can be stacked into a laminate that can be glued, heat welded, or stitched…to secure the layers together." '070 Patent, col. 18, ll. 37-40 [Joint Appx. Ex. 2]. Stacking is the assembly act; securing is the fastening step. Neither produces layers that "function as a single material." Indeed, as shown in Figure 7B of the '872 Patent, a laminate may have inner layers that remain entirely unbound, with only edges secured—a structure that, as discussed above, cannot function as a single material.




FIG. 7B

The assembling act of "laminat[ing] together" thus describes stacking and securing the constituent sheets, with the character of the resulting structure, governed by the separate constructions of "laminate" and "laminated sheet" addressed above.

### 2. Defendants' Answering Position

The term "laminated together" is used in several of the asserted claims.[11] This phrase should be given the same interpretation as "laminate" and "laminated sheet" (multiple layers joined or bonded together so that they function as a single material or layer) for the same reasons discussed above for those terms. Plaintiff's position that the verb "laminated together" means the layers are secured together in addition to being stacked, while the resulting noun "laminate" does not require the layers to be secured together at all makes no sense and is clearly wrong. Joint CC Br. at ~~59–61, 71–73~~58–60, 70–72. The Court should therefore adopt Defendants' construction which is supported by the intrinsic evidence and the plain meaning of the word "laminate."

[11] *See, e.g.*, '872 Patent at claim 1 (20:25), claim 15 (21:40), claim 26 (22:51) [Joint Appx. Ex. 3]; '574 Patent at claim 1 (20:25), claim 19 (22:6), claim 23 (22:46) [Joint Appx. Ex. 4]; '575 Patent at claim 15 (21:49–50) [Joint Appx. Ex. 5]; '707 Patent at claim 1 (20:25), claim 16 (21:33), claim 27 (22:24), claim 29 (22:48), claim 30 (23:3) [Joint Appx. Ex. 6].

### G. "flat"

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "flat" | No construction required, or alternatively, essentially planar | Indefinite or a planar arrangement or configuration without any curvature |

#### 1. Plaintiff's Opening Position

No construction of "flat" is necessary. "Flat" is among the most basic and universally understood words in the English language, describing a surface or object that is level and even rather than curved or irregular. The patents use the term in exactly this ordinary sense, and the specifications and claims provide more than sufficient context to inform any lay juror as to its meaning in the context of the claimed inventions.

The '905 Patent specification further grounds "flat" in the physical character of the claimed laminate sheets themselves. It describes the constituent material sheets as formed into "a flat, flexible sheet" through processes such as pressing fibers together with heated rollers. '905 Patent, col. 4, ll. 19–23 [Joint Appx. Ex. 7]. This description ties "flat" to a concrete physical attribute of the sheet materials as they emerge from the manufacturing process as essentially planar, opposed to three-dimensional, tubular, or irregular in form. The same understanding pervades the deployment context: the barriers are described as dropping from a mounting

structure into a deployed position covering a window or doorway, an application that requires and presupposes an essentially planar sheet geometry.

Figures 7 and 7A of the ‘872 Patent depict the claimed laminate structure as a flat, planar assembly of stacked layers, visually confirming the plain-sense meaning of the term.




*Fig. 7A*




*FIG. 7*

The specifications exemplify “flat” by direct contrast with its opposite. In describing the configuration of blind slats, the shared specification of the ‘872, ‘574, and ‘707 Patents states that “[t]he slats 10 can be made flat or curved across their transverse dimension.” ‘872 Patent, col. 9, ll. 19–22 [Joint Appx. Ex. 3]. This express pairing of “flat” against “curved” as alternative configurations confirms that

"flat" carries its plain meaning: a non-curved, essentially planar profile. No technical elaboration is required.

Any lay person asked to distinguish a flat surface from a curved one would do so without difficulty, and that common understanding is precisely what the inventors invoked. Because "flat" is a common English word used in its ordinary sense throughout the specifications and claims, no construction is required.

**2. Defendants' Answering Position**

Several asserted claims in the '872 patent, the '574 patent, and the '707 patent require that the laminate be "flat." The intrinsic record confirms that "flat" is used in a purely qualitative manner without any articulated benchmark. Specifically, the claims themselves do not provide any benchmark to determine when the laminate is flat and when it is not. In fact, several claims simply add ambiguity by adding the word "substantially" before the term "flat." *See, e.g.*, '707 Patent at 21:34–35, 22:24, 22:49 [Joint Appx. Ex. 6].

The specifications likewise do not provide any objective benchmark to determine when something is flat or not. They fail to provide any guidance as to what degree of curvature, deviation, or irregularity would still qualify as "flat." In fact, the specification mentions the term "flat" only a single time (and it does not even specifically mention a laminate): "The slats 10 can be made flat or curved

across their transverse dimension." '872 Patent at 9:38 [Joint Appx. Ex. 3]. The result is a term that depends entirely on relative judgment, not objective criteria.

That absence of an objective boundary is dispositive under *Nautilus*. Terms of degree are not per se indefinite, but they must provide "reasonable certainty" by supplying a standard for measuring scope. Here, there is none. The patents do not identify any tolerance, measurement, or functional threshold that would allow a POSITA to determine when a structure ceases to be "flat." Without such guidance, the term leaves the scope of the claims to "the unpredictable vagaries of any one person's opinion." *Datamize*, 417 F.3d at 1350.

Plaintiff's fallback construction, "essentially planar," does not cure that defect. It merely substitutes one subjective formulation for another, offering no additional guidance and leaving the same indeterminacy. Even worse, it adds ambiguity by including the term "essentially," which merely highlights that the boundary between what is flat or not is unclear. Thus, even Plaintiff's construction fails to provide "objective boundaries" and should thus be rejected. *Interval Licensing*, 766 F.3d at 1371.

Because the intrinsic record fails to supply any objective standard for determining what qualifies as "flat," the term is indefinite under *Nautilus*.

Alternatively, if the Court declines to find indefiniteness, "flat" should be construed to mean a planar arrangement or configuration without curvature. As

noted above, the only mention of the term "flat" in the specification is a comparison to curved. '872 Patent at 9:38 [Joint Appx. Ex. 3]. Thus, the only possible construction that imposes a definite boundary consistent with the intrinsic record would be for the term "flat" to mean planar without curvature.

### 3. Plaintiff's Reply Position

Defendants argue "flat" is indefinite and, alternatively, means "planar without curvature." The specification supplies an express contrast that fixes the meaning: "The slats 10 can be made flat or curved across their transverse dimension." '872 Patent at 9:38 (Defendants' own citation) [Joint Appx. Ex. 3]. Pairing "flat" against "curved" as alternatives confirms that "flat" carries its ordinary, non-curved meaning, and a meaning that a skilled artisan, and a lay juror, applies without metrology. That a term is one of degree does not make it indefinite where the intrinsic record supplies this kind of contrast. *Sonix*, 844 F.3d at 1378–79; *Indect USA*, at *11–12; *Astellas*, at *19.

Mr. Egres used the term the same way. Asked whether the consolidated laminate's layers "would … kind of be flat layers on top of each other," he answered, "That is correct." Egres Tr. 47:19–22 [Joint Appx. Ex. 15]. A skilled artisan thus applies "flat" to a layered ballistic laminate without difficulty and without any quantitative threshold, confirming that the term informs the public with reasonable certainty.

Defendants cannot have it both ways. Offering "planar without curvature" as an alternative construction concedes the term is construable, which defeats their indefiniteness theory. And the absolute "without any curvature" should be rejected: it improperly converts an ordinary descriptive term into a precision instrument and invites non-infringement disputes over ordinary manufacturing tolerances and minor contouring the patent never addresses. The modifier "substantially" in certain claims is a standard term of approximation routinely held definite. '707 Patent at 21:34–35, 22:24, 22:49 ("substantially flat") [Joint Appx. Ex. 6]. No construction is required; but alternatively, flat is understood as "essentially planar" properly characterizes "flat" in view of the specification.

#### 4. Defendants' Sur-Reply Position

Plaintiff's arguments confirm that "flat" is indefinite. Plaintiff wants to preserve infringement positions against laminates with some curvature but refuses to identify how much curvature makes a laminate not flat. Instead, Plaintiff asks for no construction or the vague phrase "essentially planar." Plaintiff's position is internally inconsistent: it says that "'flat' carries its ordinary, non-curved meaning" while also arguing that "the absolute 'without any curvature' should be rejected."

In effect, Plaintiff is asking for a boundary that permits some undefined amount of curvature. Yet Plaintiff admits the "patent never addresses" "minor contouring." This is exactly the point. The intrinsic record supplies no objective

boundaries, making "flat" indefinite under *Nautilus*. To the extent the Court determines that "flat" is not indefinite, the Court should construe "flat" to mean "planar without any curvature." *See* '872 Patent at 9:38[Joint Appx. Ex. 3].

**H. <u>"flexible"</u>**

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "flexible" | No construction required, or alternatively, capable of being flexed | Indefinite |

**1. Plaintiff's Opening Position**

Likewise, no construction of "flexible" is necessary. The word has a plain and universally understood meaning, in this case of capable of bending without breaking, and the patents use it throughout in precisely that ordinary sense. A lay juror would immediately understand what it means for those materials to be "flexible," and the specifications leave no doubt on the point.

Figure 7A of the '070 Patent and '872 Patent illustrates these flexible sheet materials in the context of the claimed laminate, depicting individually drawn layers 455 of woven anti-ballistic material stitched together into laminate 450. The discrete, cloth-like layers shown are visually consistent with the woven fabric materials described in the specification, materials whose flexibility, like that of any woven cloth, is apparent on its face.




*Fig. 7A*

The disclosures further support the common usage of "flexible" in the context of these patents. The Background sections of all three patents identify the problem: existing anti-ballistic protection systems were "usually made of metal or a material containing at least one metal plate," resulting in "extremely high weight" and rigidity. '070 Patent, col. 1, ll. 31–36 [Joint Appx. Ex. 2]; see also '905 Patent, col. 1, ll. 14–19 ("ceramics, or metal or a material containing at least one metal plate…having a heavy weight or large volume or both") [Joint Appx. Ex. 7]. The claimed invention solved this problem by substituting lightweight, cloth- and polymer-based sheet materials for rigid metal plates. "Flexible" in these patents thus has a readily understood referent: it describes the inherent physical character of woven and polymer sheet materials as distinguished from the stiff metal and ceramic plates of the prior art.

The specifications catalog the specific materials that embody this flexibility. The '070 Patent and '872 Patent identify the aforementioned materials as the anti-

ballistic sheet materials from which the claimed flexible laminates are made. '070 Patent, col. 5, ll. 60–65; col. 6, ll. 1–17 [Joint Appx. Ex. 2]. The specifications explain that these materials are formed into "a durable and tough and flexible fabric using threads and/or fibers of the material." '070 Patent, col. 6, ll. 26–30 [Joint Appx. Ex. 2]. These are textile-type and thin-film materials whose capacity to bend, their flexibility, is an inherent and immediately apparent physical property requiring no technical elaboration.

The '905 Patent reinforces this understanding with an expanded materials catalog that includes, in addition to the above materials, Dyneema (ultra-high molecular weight polyethylene), Twaron, graphene, carbon nanotubes, fiberglass, and polycarbonate, all described as being formed into "woven or unwoven cloth-like sheets of fabric" or thin individual sheets that are, in the specification's own words, "thin, like foil, paper, or cloth." '905 Patent, col. 3, ll. 33–55 [Joint Appx. Ex. 7]. The analogy to foil, paper, and cloth confirms that no special expertise or judicial construction is needed to understand what "flexible" means as applied to these sheet materials. The specification further notes that the "looseness, flexibility, and motion of the material aids in energy absorption," linking flexibility directly to the inherent physical character of the woven sheet construction. '070 Patent, col. 8, ll. 53–57 [Joint Appx. Ex. 2].

Because "flexible" has a plain meaning fully understood by lay persons, and because the specifications ground that meaning in the well-known physical properties of the specifically identified woven fabric and polymer sheet materials that make up the claimed laminates, as distinguished from the rigid metal and ceramic prior art, no construction is required.

**2. Defendants' Answering Position**

The claims require that the barrier or laminate be "flexible." *See, e.g.*, '070 Patent at claim 1 [Joint Appx. Ex. 2]; '872 Patent at claim 1 [Joint Appx. Ex. 3]; '574 Patent at claim 1 [Joint Appx. Ex. 4]; '575 Patent at claim 1 [Joint Appx. Ex. 5]; '707 Patent at claim 1 [Joint Appx. Ex. 6]; '905 Patent at claim 1 [Joint Appx. Ex. 7]. This term is yet another qualitative, result-oriented description that fails to inform a POSITA of the scope of the claims with reasonable certainty.

The claim language itself provides no guidance. It does not identify how much flexibility is required, what degree of deformation is sufficient, or what structural characteristics would make a material "flexible" within the meaning of the claims. Instead, "flexible" is used as a functional descriptor. But the claims do not define the level of flexibility needed or how a POSITA would determine when that threshold is met. As a result, the term provides no objective boundary and leaves the scope of the claims uncertain.

The specification does not cure that defect. While it repeatedly refers to "flexible" barriers or materials, it does so only in a descriptive, high-level manner without supplying any measurable standard or design criteria. Plaintiff relies on the background section discussing metal plates, arguing that this gives a way to distinguish what is flexible, but Plaintiff ignores that the same section also discusses "flimsy and weak" plastic systems. '437 Patent at 1:23–26 [Joint Appx. Ex. 1]. Moreover, while the specification may list some materials that may be used ('070 Patent at 5:60–65, 6:1–17 [Joint Appx. Ex. 2]), this does not adequately define a boundary that distinguishes between materials that are sufficiently "flexible" and those that are not. Without an objective threshold, a POSITA would have no way to determine where the line is drawn.

As already discussed, Federal Circuit precedent makes clear that such open-ended terms of degree are indefinite where the patent fails to provide objective boundaries. *Datamize*, 417 F.3d at 1350; *Interval Licensing*, 766 F.3d at 1371. Here, "flexible" is, at best, a term of degree and the intrinsic record provides no answer of where the boundary is.

Plaintiff's proposed "plain meaning" of "capable of being flexed" does not help. As a practical matter, nearly all materials, including metal plates exhibit some degree of flexibility and are capable of being flexed. That construction therefore provides no meaningful limitation and fails to supply the required objective

boundary. Such result-oriented language, untethered to any standard for measuring compliance, renders the claims indefinite.

### 3. Plaintiff's Reply Position

"Flexible" is an ordinary word, anchored in the intrinsic record by an objective engineering contrast: the patents distinguish their lightweight fabric and polymer-sheet laminates from rigid metal-plate and ceramic systems. The specification ties flexibility to "the very looseness, flexibility, and motion of the material" inherent in the woven-sheet construction, and lists the paradigmatic flexible ballistic materials: Kevlar, Tensylon, Dyneema, and boron-treated cloth. '070 Patent at 8:53–57; *id*. at 5:60–65, 6:1–17 [Joint Appx. Ex. 2]. These are textile sheet materials; any skilled artisan understands that a multi-layer laminated fabric sheet, unlike a metal plate or ceramic panel, is capable of bending and shifting upon impact.

Defendants' "everything flexes at some scale" argument ignores the POSITA lens. Claim scope is assessed through a skilled artisan reading the term in the context of the invention's purpose and disclosed materials, not at the molecular scale of steel. *Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1318–20 (Fed. Cir. 2016); *Nautilus*, 572 U.S. at 910; see *Indect USA*, at *12 (definiteness of a degree term is "highly dependent on context"). The relevant boundary, flexible textile laminate versus rigid armor plate, is objective and supplied by the intrinsic record. *Sonix*, 844 F.3d at 1377–81. Defendants' reliance on the patents' criticism

of "flimsy and weak" plastic systems misses the point. '437 Patent at 1:23–26 [Joint Appx. Ex. 1]. That some flexible materials are unsuitable does not make "flexible" indefinite; it shows only that flexibility alone does not establish infringement. The extrinsic evidence confirms that flexibility is a recognized, measurable engineering property in the ballistic-materials field, not an indefinite abstraction. A leading treatise distinguishes flexible textile and felt systems from "conventional armor materials," explaining that low-elongation fibers such as "glass, X-500, stainless steel, or even polyvinyl alcohol have not been useful" for ballistic protection, while high-elongation fibrous constructions are. Laible at 94. The field thus evaluates flexibility through objective properties, elongation, ductility, and deformation behavior, the opposite of a standardless term. Mr. Egres confirmed the point from the perspective of these very inventions, testifying that here flexibility "ties in with this idea of deployability," the ability to "roll up" and operate "much like a standard blind," and that flexibility is "understood and measured" for performance "relative to the application," "judged against the incumbent material." Egres Tr. 74:12–76:10, 27:24–29:3 (27:24–29:3 discussing [Joint Appx. Ex. 16]) [Joint Appx. Ex. 15]. That a skilled artisan evaluates flexibility relative to the application is the hallmark of a definite term of degree. No construction is required of this term. Alternatively, "flexible" is understood as "non-rigid and capable of bending in the claimed barrier

or laminate application," which captures the term without importing limitations from the specification.[12]

#### 4. Defendants' Sur-Reply Position

Plaintiff's reply confirms that "flexible" is indefinite. Plaintiff identifies no objective boundary for how much flexibility is required, relying instead on examples of textile materials that are more flexible than metal or ceramic plates. But a contrast with rigid armor does not define the claim boundary. Indeed, the patents' criticism of "flimsy and weak" plastic systems shows that not every non-rigid or bendable material qualifies. '437 Patent at 1:23–26 [Joint Appx. Ex. 1]. The unanswered question remains: how flexible is flexible enough?

Plaintiff's extrinsic evidence underscores the problem. If flexibility is judged "relative to the application," Egres Tr. 28:25 [Joint Appx. Ex. 15], it is not bounded by an objective standard; it becomes the kind of case-by-case inquiry *Halliburton* rejected. 514 F.3d at 1254–55 (term indefinite where separate infringement determination had to be made for every set of circumstances). Plaintiff's new

---

[12] During the assembly of this Joint Claim Construction Brief, Plaintiff was alerted that the wrong closing sentence to Plaintiff's Reply Brief section on "flexible" was inserted into the draft served on Defendants, which had a different constructions for this term. Plaintiff did not intend to change its proposed construction of this term through this paragraph and maintains its proposed construction identified above at this time.

proposed fallback construction ("non-rigid and capable of bending in the claimed barrier or laminate application") has the same defect. Because the intrinsic record provides no objective standard for determining when a barrier or laminate is "flexible," the term is indefinite.

## I. "flex and move"; flex and/or move"; "move and/or flex"

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "flex and move"; flex and/or move"; "move and/or flex" | flex – No construction required, or alternatively, "deforming"<br>move – No construction required, or alternatively, position change | Indefinite |

### 1. Plaintiff's Opening Position

Again, "flex and move," "flex and/or move," or "move and/or flex" is necessary are common English words whose meanings are immediately understood by any lay juror; therefore, no construction is required. The specifications across all seven asserted patents use these terms in their common and ordinary sense.

Figure 1 of the '070 and '872 Patents illustrates this structural configuration directly, depicting free-hanging barrier 100 fixed at top mounting structure 120, with unsecured sides 112 and bottom 114, and weighted end 130. This physical arrangement provides the capacity to flex and move necessarily follows from.




FIG. 1

The capacity to "flex and move" is not an abstract aspiration in certain claims; it is a direct and necessary consequence of two defined structural attributes: (1) the physical character of the claimed materials, and (2) the specified mounting configuration of those materials. As to materials, the specifications describe barriers comprised of multi-layered laminates of woven Kevlar, Tensylon, Dyneema, boron-treated cloth, and similar anti-ballistic fabrics, and expressly note that "the very looseness, flexibility, and motion of the material" is an inherent physical property of these laminated sheet constructions. '070 Patent, col. 8, ll. 53–57 [Joint Appx. Ex. 2]. These are sheets of textile materials. Any lay observer would immediately understand that a multi-layer laminated fabric sheet, unlike a metal plate or ceramic panel, is physically capable of bending and shifting position upon impact.

As to mounting configuration, the specifications describe with structural precision exactly how the barrier is attached in order to permit the claimed flexing and movement. The barrier layer is fixed at its top end to a mounting structure connected to the building, while "barrier sides 112 and a barrier bottom 114" are expressly "not secured to any structure in this free hanging embodiment." '070 Patent, col. 8, ll. 43–48 [Joint Appx. Ex. 2]. Additionally, a weighted end 130 is provided at the bottom of the barrier layer to add mass. '070 Patent, col. 8, ll. 48–52 [Joint Appx. Ex. 2]. This specific structural configuration, a fabric laminate fixed only at the top, with unsecured sides and a weighted free-hanging bottom, is what mechanically enables the barrier to flex (deform upon impact) and move (shift position as the weighted bottom lifts, swings, or displaces). The terms thus describe the inherent physical behavior of a specifically defined structure, not an unmoored functional aspiration.

The specifications further confirm that "flex and move" describes physically distinct behaviors arising from this particular structure. The barrier layer "can move, vibrate, swing," whole-body positional changes enabled by the free-hanging, weighted-bottom mounting, while the woven fabric material itself bends and deforms locally upon impact, consistent with the inherent properties of textile-based sheet materials. '070 Patent, col. 8, ll. 43–48 [Joint Appx. Ex. 2]. The specification expressly observes that "free-hanging blinds can actually perform better than blinds

that are secured at the bottom or sides," attributing this to the physical freedom of movement that the unsecured configuration provides. '070 Patent, col. 19, ll. 34–40 [Joint Appx. Ex. 2].

Because "flex and move," "flex and/or move," and "move and/or flex" describe the inherent physical behavior of specifically defined woven fabric laminates in a specifically defined mounting configuration, no construction is required.

**2. Defendants' Answering Position**

Many of the asserted claims require a barrier that will "flex" or "move." The context for these terms is crucial. Various claims require a barrier "configured to" flex or move to achieve specified results, such as absorbing energy from a ballistic object or to "further protect" the space from a ballistic object, or even to "prevent" a bullet from entering a space. *See, e.g.*, '070 Patent at claims 1, 18, 20 [Joint Appx. Ex. 2]; '872 Patent at claims 7, 19, 26) [Joint Appx. Ex. 3]; '574 Patent at claims 1, 11, 19, 21, 23 [Joint Appx. Ex. 4]; '575 Patent at claims 7, 24 [Joint Appx. Ex. 5]; '707 Patent at claims 1, 16, 27, 29, 30 [Joint Appx. Ex. 6]. In this context, "configured to" is not merely functional—it denotes that the structure is specifically designed to perform the recited function. *In re Giannelli*, 739 F.3d 1375, 1379 (Fed. Cir. 2014). Thus, the claims require a barrier that is designed in a particular way so that it will "flex" or "move" to accomplish those results.

But the claims provide no guidance as to what that design entails. They do not identify how much "flex[ing]" or "mov[ing]" is required, what type of movement is necessary, or what structural features would cause the barrier to achieve the claimed results. Nor do they provide any standard by which a POSITA could determine whether a given structure satisfies the "flex and/or move" limitation. Instead, the claims recite only the desired result (e.g., absorbing kinetic energy, further protecting a space, or preventing a bullet from entering) without defining the degree or nature of the movement required to achieve it. That leaves a POSITA to guess at both (i) how the barrier must be designed and (ii) how much movement or flexing is sufficient, rendering the scope of the claims uncertain.

The specification does not resolve that ambiguity. At most, it provides a single, high-level example suggesting that a barrier may "flex and move" if it is free-hanging. '070 Patent at 1:61–64, 3:39–44, 3:54–58, 4:61–5:10, 5:26–37, 8:4–19, 19:35–43 [Joint Appx. Ex. 2]. But that disclosure does not supply any objective standard for the required degree of movement or flexing, nor does it explain how to design a structure to achieve the claimed function. Notably, Plaintiff focuses only on this embodiment in its argument. Joint CC Br. at ~~90~~89. But the specification immediately introduces further uncertainty (which Plaintiff ignores) by stating that the barrier may still "flex and move" even when its sides and bottom are secured. *Id.* at 5:38–55 [Joint Appx. Ex. 2]. The patent provides no explanation of how a secured

barrier would be designed to "flex and/or move," no description of what degree of movement would suffice in that configuration, and no objective criteria for determining when the limitation is met.

That inconsistency is particularly problematic because many of the asserted claims require the barrier to be secured along its sides and/or bottom, while simultaneously requiring it to "flex and/or move" to achieve the claimed result. *See* '872 Patent at claims 7, 19, 26 [Joint Appx. Ex. 3]; '575 Patent at claim 7 [Joint Appx. Ex. 5]; '707 Patent at claim 30 [Joint Appx. Ex. 6]. Still others require a securing structure that is configured to engage the barrier in a manner that allows the flexing or moving. *See* '574 Patent at claims 1, 23 [Joint Appx. Ex. 4]. The intrinsic record provides no principled way to reconcile those requirements or to determine when a secured structure satisfies the limitation. As a result, the claims leave a POSITA without "reasonable certainty" as to their scope. *Nautilus*, 572 U.S. at 910.

Nor does Plaintiff's proposed "plain meaning" cure the problem. Interpreting "flex" to mean deforming and "move" to mean position change provides no objective boundary, because virtually any material can move or flex to some degree under force or impact from a ballistic object. Without any standard for how much movement or flexing is required, or how the barrier must be designed to achieve the claimed result, the limitation remains purely functional and result-oriented. Such

open-ended language, untethered to objective criteria, renders the claims indefinite. *See*, *e.g., Interval Licensing*, 766 F.3d at 1371; *Datamize*, 417 F.3d at 1350.

Accordingly, the terms "flex and move," "flex and/or move," and "move and/or flex" should be found indefinite.

**3. Plaintiff's Reply Position**

These terms describe the physical behavior of a specifically defined structure, not an unbounded result. The specification details the enabling configuration with precision: the barrier is fixed at its top to a mounting structure, while "barrier sides 112 and a barrier bottom 114" are "not secured to any structure in this free hanging embodiment," with a weighted end 130 added at the bottom. '070 Patent at 8:43–52 [Joint Appx. Ex. 2]; see Fig. 1. From that structure the barrier "can move, vibrate, swing," while the woven fabric itself bends and deforms locally on impact, distinct, described behaviors tied to the barrier's energy-absorption purpose, not an aspiration. '070 Patent at 19:34–43 [Joint Appx. Ex. 2].

Defendants' own authority defeats their indefiniteness theory. "Configured to" denotes a structure designed to perform the recited function, which the specification ties to the disclosed mounting and materials. *In re Giannelli*, 739 F.3d 1375, 1379 (Fed. Cir. 2014). A functional limitation's definiteness is "highly dependent on context," and the context here is fully supplied. *Indect USA*, at *12; *Biosig Instruments, Inc. v. Nautilus, Inc*, 783 F.3d 1374, 1378 (Fed. Cir. 2015).

That flexing and movement are part of a barrier's ballistic-protection mechanism is settled engineering, not litigation invention. A leading treatise explains that fibrous protective materials "develop ballistic resistance by applying these forces to the projectiles over relatively large distances and through relatively long periods of time," with the deformation "not localized to the area of impact, but … spread out into the material." Laible, at 97–98 [Joint Appx. Ex. 19]. Mr. Egres confirmed the same mechanism, testifying that on impact the barrier is pushed so it "distend[s] out of plane," and that this "momentum transfer" through "deformation" and "motion" is "part of the energy dissipation," an understanding shared by anyone "in the field with normal skill." Egres Tr. 69:2–70:8 [Joint Appx. Ex. 15]. The claimed flexing and movement thus describe a concrete, well-understood physical process, defeating any contention that a POSITA cannot grasp the terms' scope.

Defendants' claim of an irreconcilable "secured-barrier" inconsistency fails on the specification's own text. The patents teach that a secured barrier can still flex and move, and that free-hanging barriers "can actually perform better than blinds that are secured at the bottom or sides." '070 Patent at 5:38–55, 19:34–40 [Joint Appx. Ex. 2]. Alternative operative configurations are not contradictions; a specification disclosing two ways to achieve flex and motion supports breadth, not indefiniteness. *Indect USA*, at *10. No construction is required. If the Court finds a

construction is required, Plaintiff offers that "flex" means "deforming" while "move" means position change.

#### 4. Defendants' Sur-Reply Position

Plaintiff continues to ignore the claim context for "flex" and "move." The claims do not merely recite that a barrier can flex or move in some trivial sense. They require a barrier "configured to" flex or move to achieve claimed ballistic-protection functions, such as absorbing energy, further protecting a space, or preventing a bullet from entering. Plaintiff identifies no objective boundary for when flexing or moving satisfies that claimed configuration.

Plaintiff also never explains how a secured barrier or securing structure in a non-free-hanging embodiment is specifically designed to flex or move as claimed. The Reply never explains how much flexing or movement is required, what design makes a secured barrier "configured to" flex or move, or when ordinary impact response becomes the claimed ballistic-protection function. That absence of objective boundaries makes the terms indefinite.

### J. **“dropping”/ “drop”**

| Claim Term | Plaintiff’s Construction | Defendants’ Construction |
|---|---|---|
| “dropping”/ “drop” | “dropping” - deploying from a retracted position into a deployed position<br><br>“drop” - deploy from a retracted position into a deployed position | Indefinite or falling downward under the force of gravity |

#### 1. Plaintiff’s Opening Position

The terms “dropping” and “drop” as used in the ‘437, ‘070, and ‘872 Patents mean deploying a barrier from a retracted position into a deployed position. The specifications of those patents use “drop” and “deploy” interchangeably throughout, and expressly describe deployment modes that do not involve falling under the force of gravity alone.

Figure 6 of the ‘070 and ‘872 Patents depicts roll-up blind system 305 in the process of being deployed from its stowed position in head box 320, which includes an illustration of “dropping” in the sense of transitioning from a retracted to a deployed state.




FIG. 6

The specifications equate “drop” directly with “deploy” in multiple passages. In describing shades that transition to a protective state, the specification states: “the shade may automatically deploy (drop) when a ballistic event is detected.” ‘070 Patent, col. 15, ll. 13–14 [Joint Appx. Ex. 2]. Similarly, the ‘437 Patent describes a blind configured to have “a protective state with the blind dropping into the window frame for protecting an interior of said structure from penetration by a projectile through the window.” ‘437 Patent, cl. 24 [Joint Appx. Ex. 1]. “Dropping into the window frame” describes transitioning from a retracted state to a protective deployed state covering the window. This is precisely Plaintiff’s proposed construction.

Most dispositive, the specifications describe “dropping” as just one of multiple equivalent deployment directions, all described using the same vocabulary.

The specification expressly states: "[t]he barriers can be provided in modular sections that can deploy horizontally or vertically. The device can deploy from the top bottom or side." '070 Patent, col. 7, ll. 15–17 [Joint Appx. Ex. 2]. Immediately following this, the specification describes "[a]lternative approaches where the barrier is installed in a rising manner," deploying upward from the ground, as an equivalent alternative. '070 Patent, col. 8, ll. 47–53 [Joint Appx. Ex. 2]. The specification also describes barriers that "close from the top or bottom" and that "run left to right." '070 Patent, col. 13, ll. 5–8 [Joint Appx. Ex. 2]. When the same specification describes deployment upward, horizontally, and from the side as equivalents of deployment downward from a valance, limiting "drop" to gravity-driven downward movement would improperly exclude the bulk of the disclosed embodiments.

**2. Defendants' Answering Position**

Asserted claims in the '437 patent, the '070 patent, and the '872 patent require that the barrier or blind drop into an extended or protective position. *See, e.g.*, 437 Patent at claims 24, 28, 30, 33 [Joint Appx. Ex. 1]; '070 Patent at claims 1, 18, 20 [Joint Appx. Ex. 2]; '872 Patent at claims 1, 26 [Joint Appx. Ex. 3]. The meaning of that term is ambiguous. Both the claims and the specification leave open exactly what it means to drop. This ambiguity is only underscored by Plaintiff's argument that *any* deployment from a retracted position into a deployed position qualifies for

"dropping." As such the term is indefinite. To the extent the term is found to not be indefinite, the Court should construe it to mean "falling downward under the force of gravity" based on the intrinsic record.

The claim language itself provides no clarity. It does not specify how the barrier drops. For example, the '437 patent simply indicates that the protective state involves "the blind dropping into the window frame." '437 Patent at claim 24 [Joint Appx. Ex. 1]. While the claims reference an "actuator" in the '437 patent and a "deployment mechanism" in the '070 patent, there is no indication of what that mechanism or actuator is or whether the term requires any particular type of motion, such as gravity-driven falling versus mechanically-driven deployment. Nor does it identify any structural features that would distinguish a system that "drops" from one that merely lowers, extends, or is otherwise deployed. As a result, the term leaves open fundamental questions about the nature of the claimed movement, rendering its scope uncertain.

The intrinsic record confirms this ambiguity. For example, the '437 patent does not use the term "drop" outside of the claim, leaving a POSITA guessing as to what it means when it shows up in the claim. The other patents do not resolve the ambiguity because they suggest that "deployment through activation of a motor" is a different option than "deployment through activation of a … drop function," without making it entirely clear whether they are different or the same. '070 Patent

at 8:40–45 [Joint Appx. Ex. 2]; *see also id.* at 15:42–50 (describing shutting off a device to release the blind as an alternative to a motor). The other patents also describe features that would assist if gravity is the driving force. *Id.* at 14:10–22. Yet the patents do not expressly distinguish "dropping" from other forms of downward deployment.

The prosecution history likewise fails to provide any limiting definition. The patent office relied on a prior art reference in which the blinds would "be lowered by gravity" when addressing the "dropping" claim feature. *See* '437 File History, Final Office Action dated May 31, 2017, at 18 (p. 217 of 405) [Joint Appx. Ex. 21]. While this suggests that dropping is equivalent to being gravity-driven, there is no clear statement that would inform a POSITA whether "dropping" requires gravity-driven motion, excludes powered movement, or encompasses both. The absence of such guidance leaves the term susceptible to multiple reasonable interpretations.

That ambiguity is dispositive under *Nautilus*. A claim term must inform a POSITA of the scope of the invention with "reasonable certainty." 572 U.S. at 910. Here, a POSITA would not know whether a barrier that is lowered by a motor, guided along tracks, or otherwise mechanically deployed satisfies the "drop" limitation, or whether the term is limited to free-fall or gravity-driven motion. This uncertainty goes directly to claim scope and renders the term indefinite. *See Interval Licensing*, 766 F.3d at 1371 (claims must provide "objective boundaries").

Plaintiff's proposed construction, equating "drop" with any deployment from a retracted to a deployed position, only underscores the problem. That construction reads the term "drop" out of the claims entirely and expands it to cover any form of movement, regardless of direction or mechanism. It provides no limiting principle and fails to resolve the ambiguity in the intrinsic record. Such an interpretation is improper under *Phillips*, which requires that claim terms be given meaning, not ignored.

Accordingly, "drop" should be found indefinite.

Alternatively, if the Court declines to find indefiniteness, "drop" should be construed to mean falling downward under the force of gravity, which is the interpretation most consistent with the specification's teachings differentiating a drop mechanism from a motor ('070 Patent at 8:40–45 [Joint Appx. Ex. 2]), indicating the use of weight to assist (*id.* at 14:10–22), and matching the indication of automatically entering the protective state in emergency situations (*id.* at 11:56–60).

**3. Plaintiff's Reply Position**

Defendants argue "drop" is indefinite or limited to "falling downward under the force of gravity." Both positions founder on the specification, which equates "drop" with "deploy" and forecloses a gravity-only reading. The patentee wrote that "the shade may automatically deploy (drop) when a ballistic event is detected" (a

parenthetical that equates the two terms as a matter of lexicography), and claim 24 of the ’437 Patent recites a “protective state with the blind dropping into the window frame,” describing a retracted-to-deployed transition. ’070 Patent at 15:13–14 [Joint Appx. Ex. 2]; ’437 Patent at cl. 24 [Joint Appx. Ex. 1]. Where the patentee defines a term by equating it with another, that definition controls. *Thorner*, 669 F.3d at 1365–66.

Defendants’ effort to separate motor-driven deployment from “drop” misreads the specification. The patents treat references to motors, release devices, and automatic functions as mechanisms that cause or control the transition from retracted to protective position; they do not redefine “drop” to require gravity-only movement. ’070 Patent at 8:40–45 [Joint Appx. Ex. 2].

A gravity-only construction would read out the bulk of the disclosed deployment modes. The specification provides that “[t]he barriers can be provided in modular sections that can deploy horizontally or vertically,” that “[t]he device can deploy from the top bottom or side,” and that barriers may be “installed in a rising manner” deploying upward, or “close from the top or bottom” and “run left to right.” ’070 Patent at 7:15–17, 8:47–53, 13:5–8 [Joint Appx. Ex. 2]. Limiting “drop” to gravity-driven downward movement would exclude upward, horizontal, and side deployment, an impermissible result that renders disclosed embodiments inoperable. *Liebel-Flarsheim*, 358 F.3d at 906–08.

Nor does the prosecution history supply a gravity limitation. That an examiner described a prior-art reference as gravity-lowered is not a "clear and unmistakable" surrender by the patentee of powered or non-downward deployment. *Omega Eng'g*, 334 F.3d at 1323–24. And as with "flat," Defendants cannot have it both ways: offering "falling downward under the force of gravity" as an alternative construction concedes the term is construable, defeating their indefiniteness theory.

Plaintiff's construction of "deploy(ing) from a retracted position into a deployed position" for "drop"/"dropping" matches Defendants' own primary alternative, minus the unsupported gravity limitation.

#### 4. Defendants' Sur-Reply Position

Plaintiff's arguments relating to "drop" are baseless. First, there is no support for Plaintiff's lexicography arguments. The standard for finding lexicography is "exacting." *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014). It requires the patentee to "'clearly set forth a definition of the disputed claim term,' and 'clearly express an intent to define the term.'" *Id.* (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)). Here, that is missing. Plaintiff relies only on "drop" in a parenthetical after "deploy." But "[s]imply referring to two terms as alternatives … is not sufficient to redefine a claim term." *Thorner*, 669 F.3d at 1368.

Second, Plaintiff wrongly assumes that the term "drop" must be construed to include all horizontal and vertical deployments. But the Federal Circuit has repeatedly cautioned against assuming that a claim covers all disclosed embodiments. *SIMO Holdings, Inc. v. H.K. uCloudlink Network Tech., Ltd.*, 983 F.3d 1367, 1378–79 (Fed. Cir. 2021) (collecting cases). Plaintiff's position that "drop" includes any manner of deploying makes no sense and is contradicted by Plaintiff's arguments during prosecution that DeGaglia's "protective shield [] *rises* to a protected state without … any ability to *drop* into the window frame for a protective state." '437 Patent File History, Resp. to Office Action dated August 12, 2016 at 7 (p. 292 of 405) (emphases in original) [Joint Appx. Ex. 22].

Plaintiff's arguments confirm "drop" is indefinite. To the extent "drop" is not indefinite, the Court should construe the term as "falling downward under the force of gravity."

Dated this ~~24th~~31st day of July, 2026.

By: */s/ Sean T. O'Kelly*
Sean T. O'Kelly (No. 4349)
O'KELLY & O'ROURKE, LLC
824 N. Market Street, Suite 1001A
Wilmington, DE 19801
(302) 778-4001
sokelly@okorlaw.com

Michael B. Marion
BYCER & MARION, PLC
7220 North 16th Street, Suite H

By: */s/ Francis DiGiovanni*
Francis DiGiovanni (No. 3189)
Thatcher A. Rahmeier (No. 5222)
FAEGRE DRINKER BIDDLE & REATH LLP
222 Delaware Ave., Suite 1410
Wilmington, DE 19801
(302) 467-4200
francis.digiovanni@faegredrinker.com
thatcher.rahmeier@faegredrinker.com

Phoenix, Arizona 85022
(602) 944-2277
michael@bycermarion.com

*Attorneys for Plaintiff*
*Disruptive Resources, LLC*

*Of Counsel:*
Mark P. Walters
Miles A. Yanick
Steve Merrill
LOWE GRAHAM JONES PLLC
1325 Fourth Avenue, Suite 1130
Seattle, WA 98101
(206) 381-73300
walters@lowegrahamjones.com
yanick@lowegrahamjones.com
stevem@lowegrahamjones.com

*Attorneys for Defendants*
*Ballistic Barrier Products Inc. and*
*Mayday Security Solutions LLC*